UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROCHESTER-GENESEE REGIONAL
TRANSPORTATION AUTHORITY,

                              Petitioner,


          vs.


BRIGID HYNES-CHERIN, as Regional Administrator
for Region II of the Federal Transit Administration,


                              Respondent,


     and


UNITED FOOD AND COMMERCIAL WORKERS
DISTRICT LOCAL ONE, and LAIDLAW TRANSIT,
INC., doing business as Laidlaw Education Services,

                         Intervenors.                    DECISION & ORDER

                                                         07-CV-6378L
_____

ROCHESTER CITY SCHOOL DISTRICT,

                         Petitioner-Intervenor,


          vs.


BRIGID HYNES-CHERIN, as Regional Administrator
for Region II of the Federal Transit Administration,


                              Respondent,


     and


UNITED FOOD AND COMMERCIAL WORKERS
DISTRICT LOCAL ONE, and LAIDLAW TRANSIT,
INC., doing business as Laidlaw Education Services,

                              Intervenors.

_____

This case is about which bus company transports high school students to school in Rochester, New York.  Although it might seem unusual for a federal court to decide such things, it is necessary here because a federal agency, the Federal Transit Administration ("FTA") has issued several orders in the past six months barring one such bus company, the Rochester-Genesee Regional Transportation Authority ("RGRTA"), and its subsidiary, the Rochester Transit Service ("RTS") from transporting these students, based on its interpretation of a federal statute, 49 U.S.C. § 5323(f) and regulations implementing it.  RGRTA has appealed to this Court under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, claiming that FTA acted arbitrarily and capriciously by prohibiting RGRTA from doing what it and the local school district, the Rochester City School District ("RCSD"), intended concerning transportation of students.

I determine that one of the FTA's decisions, the most recent one of October 12, 2007, is indeed arbitrary and capricious in that it is clearly inconsistent with the controlling statute and regulations on the issue.

## BACKGROUND

Although not required to do so, for many years RCSD has provided free bus service for all of its students, elementary and high school.[1]  Unlike some school districts, RCSD does not own and maintain a fleet of school buses.  For at least the past decade preceding this dispute, RCSD principally used two bus service providers, RGRTA, the public bus company serving Rochester

---

[1]Service is generally not provided to a high school student living within one and one-half miles of the student's selected school.  Dkt. #8 Ex. O.

and its environs, and Laidlaw, Inc. ("Laidlaw"), a national, private bus company that provides school bus service using its fleet of traditional-looking, yellow school buses.

One might think that the RCSD's decision as to which provider to use would be an economic one: that is, which entity can provide the necessary service at the most reasonable cost to RCSD and, ultimately, the taxpayers of the City of Rochester.   If it only were so simple.

RGRTA is a public bus company that receives substantial federal funds to provide public transportation to the citizens it serves.  Its receipt of federal monies is conditioned in several ways. One such condition, which is at the heart of this dispute, is set forth in a simple, seemingly straightforward sentence in a federal statute at 49 U.S.C. § 5323(f).  In pertinent part, that statute provides as follows:

> **Schoolbus transportation.–**
>
> (1) Agreements.–Financial assistance under this chapter [dealing with public transportation] may be used for a capital project, or to operate public transportation equipment or a public transportation facility, only if the applicant agrees not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator.

In a nutshell, FTA, acting on a complaint from a union representing bus drivers employed by, among others, Laidlaw, ruled that both RGRTA's existing and proposed bus services for high school students violate the statute as well as regulations implementing the statute.  RGRTA and RCSD, which has been allowed to intervene in this action, vigorously disagree.  Laidlaw and United Food and Commercial Workers District Local One (the "Union"), which have also been allowed to intervene, argue with equal vigor that FTA's decision is the proper one.

The statute is not the focus here as much as the regulations implementing it.  The regulations carve out some significant exceptions from the prohibition in the statute barring recipients of mass transit funds from providing school bus service.  RGRTA and RCSD claim that

the proposed service fits well within both the statute and the exceptions authorized by the agency's own regulations.  FTA, of course, disagrees and has directed RGRTA to cease its service as set forth in several proposals from the RGRTA, and has indicated that it intends to impose financial sanctions by reducing RGRTA's federal subsidy.

The regulation principally at issue here provides that so-called "tripper service" by a bus company receiving federal funds is **not** barred by the statute.  The battleground in this case centers on what constitutes permissible tripper service.

The several sections of the regulations on the issue are not lengthy, but each side labors over the meaning of virtually every word.  The place to start is 49 C.F.R. § 605.13, which provides that "[t]he prohibition against the use of buses, facilities and equipment funded under the Acts shall not apply to tripper service."  That regulation flatly states that a bus company's tripper service is *not* barred by the statute which precludes a recipient from providing school bus transportation services.

The regulations define "tripper service" at 49 C.F.R. § 605.3:

Tripper service means regularly scheduled mass transportation service which is open to the public, and which is designed or modified to accommodate the needs of school students and personnel, using various fare collections or subsidy systems.  Buses used in tripper service must be clearly marked as open to the public and may not carry designations such as "school bus" or "school special."  These buses may stop only at a grantee or operator's regular service stop.  All routes traveled by tripper buses must be within a grantee's or operator's regular route service as indicated in their published route schedules.

RGRTA contends that it meets each and every one of the requirements for "tripper service" under § 605.3.  In its view, FTA was arbitrary and capricious in finding to the contrary.  I agree.

In support of their positions, the parties spend considerable time discussing past practices of FTA, similar services in other communities that seem to mirror what FTA has found

objectionable here in Rochester, federal case law and other pertinent decisions of FTA.  While some of those matters–particularly past FTA decisions concerning tripper service–are certainly relevant to the issue of whether FTA has acted arbitrarily and capriciously, the Court must look principally at the statute and the precise language of the regulations which were adopted, presumably to assist citizens in determining what is and what is not permissible in terms of transporting students.  It is clear beyond doubt that not all transportation of students is barred.  The regulations provide several circumstances when such is contemplated and permissible.

## HISTORY OF PRIOR DEALINGS AMONG THE PARTIES

Although FTA urges the Court not to consider the prior relations among the parties and to focus only on the decisions appealed from, such a view is too myopic.  As indicated, an agency's prior interpretation of the regulations may well have a bearing on whether its present interpretation is arbitrary.  *See National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

RGRTA has established, convincingly, that it has been heavily involved in transporting Rochester students for over a decade, without objection or complaint by FTA.  Laidlaw has also been involved in transporting a sizable number of students in the community.  Together these two entities provided the transportation and RCSD paid both substantial sums pursuant to various contracts and subsidy agreements.  For many years, both RGRTA and Laidlaw seemed to co-exist reasonably well.

RGRTA, through its subsidiary, RTS, has been providing service to several Rochester-area high schools since at least the mid-1990s.  For example, RCSD has subsidized the fares of students attending certain schools that are on or near existing RTS bus routes.  The students attending those schools have been able take RTS buses to school using routes that have not been designed or modified in any way to accommodate the needs of the students.  *See* Letter from RTS to FTA dated Aug. 24, 2004 at 2 (A. 25).[2]  Other routes were modified to accommodate students' needs, but apparently without objection by Laidlaw, FTA, or anyone else, *id.*[3]

In fact, as RGRTA points out, FTA has conducted periodic reviews of its service, referred to by the parties as "triennial" reviews.  These reviews of RGRTA's operations, which are mandated by Congress, *see* 49 U.S.C. § 5307(h)(2), to determine RGRTA's compliance with the conditions imposed on it as a recipient of federal funds, *never* voiced any objection to the company's activities in transporting students to and from school.  FTA now attempts to minimize the significance of those seemingly positive reviews by suggesting they were not meant to be in-depth, comprehensive audits.

The statute mandating the triennial reviews, however, expressly requires FTA to "review and evaluate *completely* the performance of a recipient in carrying out the recipient's program, specifically referring to compliance with statutory and administrative requirements and the extent to which actual program activities are consistent with the activities proposed under subsection (d)

_____

[2]"A." refers to the administrative record (Dkt. #120) submitted by RGRTA.

[3]Laidlaw denies RGRTA's assertion that these routes provided "tripper service." *See* Laidlaw's Statement of Material Facts (Dkt. #140) at 2-3.  There appears to be no dispute, however, that until the complaints giving rise to this action, none of the parties had objected to the service that RTS was providing to high school students.

of this section ... ."  49 U.S.C. § 5307(h)(2).  Section 5307(d) provides in pertinent part that "[a] recipient may receive a grant in a fiscal year only if ... the recipient ... submits a final program of [proposed] projects ... and a certification for that fiscal year that the recipient ... (iv) will comply with section[] 5323 ...," which contains the provision concerning school bus service.

If the FTA considered these reviews to be cursory, that message was certainly not conveyed to the recipient.  RGRTA certainly prepared for such reviews and provided the FTA with requested information.

The most recent FTA triennial review of RGRTA's operations, dated April 2006 (Dkt. #7 Ex. D), states that "[d]uring this triennial review of RGRTA, no deficiencies were found with FTA requirements for school bus" service.  *Id.* at 7.  The review document further states that the "review was performed in accordance with FTA procedures ... and included preliminary reviews of documents on file at the [FTA] Region II Office in New York, NY, and on-site discussions and review of the procedures, practices and records of RGRTA as deemed necessary.  ... During the visit, administrative and statutory requirements were discussed, documents were reviewed, and facilities were toured."  *Id.* at 1.  Although there were some issues in other areas, there were no adverse comments whatsoever relating to school bus operations.

The present problem started in the 2006-07 school year.  At that time, RCSD decided to change the start time at some of its high schools, from 7:30 to 8:30 a.m., for pedagogical reasons. It does not appear to be disputed that Laidlaw, the entity transporting the bulk of RCSD's high school students at that time, could not or would not provide such service, apparently because it simply did not have enough buses or drivers to service those schools at the new start times, while also continuing to meet its contractual obligations with RCSD to service the elementary schools,

whose pickup times conflicted with the new start times for high school students.  RCSD's needs could not be met by Laidlaw and Laidlaw did not then and does not now contend otherwise.

At this point, RCSD approached RGRTA to provide this service.  On July 1, 2006, RCSD entered into a "Tripper Service Subsidy Agreement" ("Subsidy Agreement") with RGRTA to service four high schools, Thomas Jefferson ("Jefferson"), Franklin, Frederick Douglass ("Douglass") and Dr. Freddie Thomas ("Thomas"), at which the start times were being changed. The Subsidy Agreement stated, *inter alia*, that "RTS has established certain public bus routes ... (the 'Route' or 'Routes') which are part of the RTS public transportation system and have been designed or modified to accommodate the transportation needs of students who attend classes at certain schools operated by RCSD."  (A.30.)  Stating that it "believe[d] that a number of benefits [such as increased attendance] will result from its students" using the buses on those routes to get to and from school, RCSD said that it "wishe[d] to facilitate transportation for its students on the Routes by subsidizing their fare for the Routes in accordance with the terms of this Agreement." *Id.*

Under the terms of the Subsidy Agreement, which was to run from September 7, 2006 to June 21 2007 (and which has since been renewed through 2010), RCSD agreed to pay RTS $5,970,000 during the term of the agreement, in return for which RGRTA agreed that anyone bearing a valid "RCSD Identification Card" would be permitted to ride, for free, any RTS bus from 5:30 a.m. to 10:30 a.m., and from 1:00 p.m. and 7:00 p.m., on days when RCSD schools were in session.  (A. 31.)  In addition, RCSD "acknowledge[d] that the Routes are and will be public bus

routes, will not be exclusively for the benefit of RCSD students and will be open to the general public at the RTS standard fare." *Id.*[4]

At the time, it did not appear that Laidlaw had any objection to such an arrangement. In fact, in early April 2006, RCSD, RGRTA and Laidlaw had entered into a memorandum of understanding ("MOU"), which provided in part that "[t]he Parties ... agree that transportation previously provided to the aforementioned sites [*i.e.*, Jefferson, Franklin, Douglass and Thomas] by Laidlaw Educational Services, will be provided by RTS beginning September 2006." (A. 137.) The MOU further provided that "[w]hereas the current extension of the Parties [sic] contract for Transportation of Pupils I expires June 30, 2007, it is the desire of the Parties to extend the current contract for an additional two-year term (through June 30, 2009) ... ." *Id.* In other words, Laidlaw agreed that RTS would service the four high schools in question, but otherwise its own contract with RCSD for primary school students would be extended for two years. This obviously was a benefit to Laidlaw.

As will be discussed below, Laidlaw has conceded during this litigation, which began in August 2007, that it has neither the buses nor the drivers to meet the needs of the RCSD high school students if the District does what it wishes to do:  start its high schools at an earlier time. At the argument before this Court on December 20, 2007, Laidlaw's counsel conceded that even now it cannot meet RCSD's requirements in that regard. Counsel stated that he "hoped" or expected

---

[4]The routes in question were listed as an exhibit to the Subsidy Agreement. Although the agreement stated that it "pertain[ed]" to those routes, *see* A. 32 § 8, which were identified as the routes that had been "designed or modified to accommodate the transportation needs of students who attend classes at certain schools," RGRTA agreed to provide free transportation on *all* RTS routes during the specified hours to any student with a valid RCSD identification card.

that such service would become available, but not before the start of the new school year in September 2008.

Although not relied on principally by RGRTA, the pertinent regulations do provide for an exemption from the school bus ban, if a private schoolbus operator cannot provide the required service.  Clearly then, not all school bus operations are banned, only certain ones, under certain circumstances.

Not only the regulations, but the statute itself, provide for an exception to the general prohibition of school bus service in such a circumstance.  The statute (§ 5323(f)) which conditions receipt of federal financial assistance on the recipient's agreement not to provide school bus transportation in competition with a private school bus operator, states that "[t]his subsection does **not** apply ... unless a private schoolbus operator can provide adequate transportation that complies with applicable safety standards at reasonable rates ... ."  (Emphasis added).  49 U.S.C. § 5323(f)(1)(B).  To implement that statutory provision, the regulations provide that a school bus provider can petition FTA for an exemption from the ban on providing such service, if it "demonstrates to the satisfaction of the [FTA] ... [t]hat private school bus operators in the urban area are unable to provide adequate transportation, at a reasonable rate, and in conformance with applicable safety standards."  49 C.F.R. § 605.11.  Here, while RGRTA has not filed such a petition, it appears that it could have done so since Laidlaw, by its own admission, could not provide the complete service that the customer, RCSD, needed in 2006, 2007, and even now in 2008.

RGRTA took a different tack.  It insisted at the time of the contract and especially now, in light of modifications it has proposed to make to its services, that the proposed service falls well within the definition of "tripper service," which is exempt from the school bus service ban.

As mentioned, although Laidlaw apparently could not provide the necessary service, and it also signed the MOU waiving or abandoning its intent to transport high school students at certain schools, the Union filed a complaint with FTA in June 2006, claiming that the service provided by RGRTA during the 2006-07 school year violated the federal statute and regulations concerning school bus service.  (A. 41.)  It is not clear whether Laidlaw, in spite of the MOU, participated ,or at least acquiesced, in the Union's complaint.

The Union's complaint led to FTA's decision issued on January 18, 2007 (Dkt. #7-3), in which the agency concluded that "through the provision of service with route numbers over 99 [*i.e.*, the new routes to the four high schools listed above], RGRTA has engaged in school bus operations."  Dkt. 7-3 at 8.  FTA ordered RGRTA to "cease and desist from this school bus service as soon as it is feasible."  *Id.*

Some time in March 2007, representatives of FTA and RGRTA met to discuss the FTA's decision.  (A. 78.)   RGRTA immediately took steps to deal with the FTA's concerns.  As a followup to that meeting, RGRTA sent a letter to FTA dated March 20, 2007, stating that it wanted to "point out portions of [the January 18 decision] that we do not understand and about which we need further clarification, try ourselves to clarify some factual matters that appear to have been misunderstood by [FTA], and suggest some specific changes that we propose to make to the [routes in question] in order to address [FTA's] concerns."  (A. 54.)  In that 24-page letter, RGRTA made various legal arguments why it believed that the routes in question met the

definition of "tripper service," and also outlined several proposed changes aimed at "do[ing] an even better job of making sure that is clear [sic] the Tripper Service routes are 'open door' and are available to all member of the general public." (A. 75.) For example, RGRTA stated that it was going to install bus stop signs adjacent to the schools served by the purported tripper routes, and that it would change its "Schedule Book" to indicate dates when a different schedule would be followed to correspond to earlier-than-usual school dismissal times. (A. 75-76.)

On April 5, 2007, FTA sent a letter to the Union, stating that "FTA has decided to reopen the [January 18] Decision in order to also allow the Union the opportunity to enter a sur-reply to RGRTA's [March 20] Reply. At the conclusion of our review, FTA will issue a new decision in this matter." (A. 78.)

FTA then accepted additional submissions from both the Union and RGRTA. On July 30, 2007, FTA issued a second decision, which, after referencing and discussing the submissions that it had received from the Union and RGRTA since its January 18 decision, "reaffirm[ed] its earlier Decision that the substance of RGRTA's service contravenes the purpose and intent of the statutory school bus prohibition and FTA's regulations." (A. 1.) FTA listed a number of reasons for that conclusion, including its finding that "[t]he routes are specifically designed for school children and only incidentally serve members of the general public." (A. 8-9.) FTA ordered RGRTA to "cease and desist and not reinstitute such service prior to the commencement of the fall 2007 academic year." (A. 11.) FTA noted that its decision was "subject to judicial review pursuant to the Administrative Procedure Act, 5 U.S.C. 701-706." *Id.*

RGRTA commenced this action on August 2, 2007, seeking judicial review of FTA's July 30 decision and an order enjoining FTA from enforcing that decision pending such review. On

August 28, 2007, the Court issued a Decision and Order staying FTA's decision until October 1, 2007.  506 F.Supp.2d 207.  That stay has since been extended by the Court until February 15, 2008.  Dkt. #47.

The day after the Court issued its stay, August 29, 2007, RGRTA wrote to FTA to request a meeting to pursue the Court's suggestion that the parties attempt to work together to come up with a plan by which RGRTA could provide permissible tripper service.  Dkt. #52-2 at 2; *see* 506 F.Supp.2d at 210.  In that letter, RGRTA described a new proposal to "eliminat[e] all current routes with numbers above 200 [which were the routes that FTA had found objectionable] and permitting the RCSD students to ride only our existing routes ...," to which "[o]nly a few modifications ... would be needed ... ."  Dkt. #52-2 at 3.  The gist of this proposal was that RGRTA would begin running what it called "Express Service" that would "bypass the downtown [Rochester] area using the Inner Loop," a limited-access highway encircling downtown Rochester.  Whereas most RTS routes operate according to a "hub and spoke" system, either beginning or ending at a transfer point downtown, an Express Service bus would run along an existing route until it reached the Inner Loop, which the bus would then take–bypassing downtown altogether–to a point where it would resume service along another existing route.[5]  *Id.* at 4.  RGRTA also proposed other changes intended to address FTA's concerns, and stated that it "would appreciate

---

[5]For example, under the current hub-and-spoke system, a student (or other passenger) wishing to travel by bus from the Thurston Road area to East Main Street (where East High School is located) would have to take the #2 Thurston bus to downtown and transfer to a different bus on the #8 East Main route.  Under the proposed Express Service, the student could take a express bus that would run along the #2 route until it reached the Inner Loop, which it would take to the East Main Street exit, from which it would follow the #8 route.  There would be no stops downtown, and no need to transfer to a different bus.  Dkt. #52-2 at 4.

whatever guidance [FTA could give RGRTA] in connection with [RGRTA's] efforts ... to

compl[y] with [FTA's] interpretation of the regulations."  *Id.* at 8.

By letter dated August 31, 2007, FTA stated that it "st[ood] ready to meet with RGRTA to

consider RGRTA's proposals for conforming RGRTA's school bus service to fit within the

parameters of FTA's prohibition against school bus operations," adding, however, that "[a]s a

prerequisite to any meeting with RGRTA, ... we will require Laidlaw's assurance that the School

District ... is following up with Laidlaw ... to ensure the provision of service by October 1, 2007

should RGRTA's service not conform with FTA requirements."  (A. 80.)

FTA sent a copy of its August 31 letter to Laidlaw (A. 81), which then wrote to FTA on

September 7, 2007, stating that it had sent proposals for substitute school bus service to RCSD, but

had not yet received a response.  (A. 149.)  Laidlaw also indicated its desire to send a

representative to any meetings between FTA and RGRTA concerning RGRTA's latest proposal.

(A. 150.)

On September 7, 2007, FTA wrote to counsel for both RGRTA and Laidlaw, stating that

FTA "s[aw] no reason to exclude any party's counsel from the [upcoming] meeting."  (A. 85.)  On

September 19, 2007, a meeting was held with representatives from FTA, RGRTA, Laidlaw, the

Union and RCSD.  At the meeting, RGRTA explained in detail its proposal for the new Express

Service.

The day after the meeting, FTA wrote to RGRTA, stating that it "found RGRTA's

presentation informative and helpful," but added that "the presentation also raised several

important questions ... ."  (A. 110.)  FTA asked RGRTA to provide additional facts concerning

some of the details of its proposal.  *Id.*  RGRTA responded by letter dated September 25, 2007.
(A. 111.)

On October 12, 2007, FTA issued a decision in which it "determined that the majority of
the proposed service (Express Service) would violate FTA's school bus regulations ... ."  (A. 12.)
FTA did find that proposed "loop-like" extensions to four of its existing routes "would satisfy
FTA's tripper service requirements, if appropriately publicized," but otherwise it found that
RGRTA's proposed new routes "share much of the same characteristics and rationale as the service
we examined [and found impermissible] in the January 18, 2007 and July 30, 2007 decisions."  (A.
13.)  FTA stated, *inter alia*, that the proposed new "routes constitute school bus service because
RGRTA admittedly designed the routes to meet the needs of the Rochester City School District ...,
not the general public."  (A. 14.)

Although not the only reason cited by FTA in support of its conclusions, RGRTA's intent
in designing the proposed new system–specifically, its intent to provide transportation for RCSD
students–was clearly a significant factor in FTA's decision.  FTA stated that "RGRTA
acknowledged in the September 19, 2007 meeting that the 'demand' it sought to meet in
developing the proposed routes was that of the School District."  (A. 16.)  Similarly, FTA said that
the proposed routes were "clearly (and admittedly) ... intended to substitute for school bus
transportation previously provided by the private school bus industry."  *Id.*  FTA described the new
routes as part of "RGRTA's apparent attempt to systematically take over school bus service for
Rochester's school district, to the detriment of the private school bus industry and its workers."
(A. 17.)

FTA concluded by stating that it was "ready to meet with RGRTA again to discuss proposed tripper service in the Rochester area."  FTA added an important caveat, however:  "FTA expects RGRTA, once and for all, to accept its inability as a matter of law to start from the *premise* that it may design service exclusively for school students, in competition with the private sector, and then work from there to modify the service to meet FTA's requirements."  (A. 18.)  FTA ended by stating that "[i]f RGRTA seeks guidance from FTA on how it can design service exclusively for students and then make technical modifications to give the appearance of complying with the definition of 'tripper service' and Section 5323(f), RGRTA misses the point entirely."  *Id.*  In other words, pretty much anything the RGRTA did would be banned if its intent was to service students.

FTA issued another decision three days later, on October 15, 2007.  (A. 19-23.)  That decision was prompted by a complaint that had been filed by Laidlaw on June 14, 2007 (A. 120), which in turn had been occasioned by a recent expansion of the Subsidy Agreement between RCSD and RGRTA to include RCSD students attending two additional schools, Marshall High School ("Marshall") and Wilson Foundation Academy ("Wilson").  Those schools had previously been serviced by school buses operated by Laidlaw.

In its complaint, Laidlaw referenced FTA's January 18, 2007 decision, and stated that "RGRTA's triple-digit route-number operations continue unabated in direct violation" of FTA's cease-and-desist order concerning the routes at issue in that decision.  (A. 121.)  Presumably aware that it had agreed in the MOU that RGRTA could service those routes, Laidlaw stated that "[t]he subject of this complaint is RGRTA's compounding of its defiance of the FTA Decision by recently negotiating with the School District to expand its illegal, self-proclaimed 'Tripper Service'" by adding new routes servicing Marshall and Wilson.

In its October 15 decision, FTA "f[ound] RGRTA in violation of its school bus regulations for the reasons set forth in [FTA's] July 30, 2007 decision." (A. 22.)[6]  Although FTA thus relied primarily on its prior decision issued in response to the Union's complaint, it did add some observations and comments about why it found the challenged service to be in violation of the regulations.

In doing so, FTA again focused on RGRTA's "intent" in designing the routes in question. For example, FTA noted RGRTA's intent to service RCSD students, stating that "RGRTA's routes are carefully designed to pick-up and drop-off students in neighborhoods that contain clusters of Marshall High School and Wilson Foundation Academy students." (A. 22.)  FTA also commented, however, on what it perceived to be RGRTA's broader intent to displace private school bus operators throughout Rochester, stating that "RGRTA has established a pattern of systematically taking over school bus routes from private school bus operators." (A. 23.)  FTA again ordered RGRTA to cease and desist from operating the challenged routes.  *Id.*

On November 5, 2007, RGRTA filed an Amended Petition for Judicial Review and Complaint for Declaratory Relief (Dkt. #52) in this Court, seeking review of FTA's July 30, October 12, and October 15, 2007 decisions.  Pursuant to the Court's prior stay orders, enforcement of all three of those orders has been stayed until February 15, 2008, pending a decision by the Court on the merits of RGRTA's appeal.

---

[6]This finding came as no surprise to RGRTA, which had stated in a submission to FTA dated September 14, 2007 that "[s]ince this service is identical to the service that [FTA] previously found constituted impermissible school bus service in [its] July 2007 decision ..., we assume that you will come to the same conclusion with respect to these routes." (A. 125.)

**DISCUSSION**

## I. Review of Agency Actions under the APA:  General Principles

The APA provides that a reviewing court shall set aside agency action, findings and

conclusions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law ... ."  5 U.S.C. § 706(2).  *See, e.g., Fox Television Stations, Inc. v. Federal*

*Communications Com'n*, 489 F.3d 444, 454-55 (2[d] Cir. 2007).  "Agency action is arbitrary and

capricious 'if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise.'"  *Riverkeeper, Inc. v. U.S.*

*E.P.A.*, 475 F.3d 83, 117 (2[d] Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is

not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The United States Supreme Court has instructed that "[a]n agency's interpretation of the meaning

of its own regulations is entitled to deference 'unless plainly erroneous or inconsistent with the

regulation.'"  *National Ass'n of Home Builders v. Defenders of Wildlife*, ___ U.S. ___, 127 S.Ct.

2518, 2537-38 (2007) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *accord Forest Watch*

*v. United States Forest Serv.*, 410 F.3d 115, 117-18 (2[d] Cir. 2005).  *See also Riverkeeper*, 475 F.3d

at 117 ("An agency's interpretation of its own ... regulation must be given controlling weight

unless it is plainly erroneous or inconsistent with the regulation") (quoting *Fowlkes v. Adamec*, 432

F.3d 90, 97 (2ᵈ Cir. 2005)).  An agency's action will be upheld, then, so long as the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Riverkeeper*, 475 F.3d at 117 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

At the same time, however, "[i]t is well established that, despite the narrow scope of court review of FLRA decisions, any agency's 'unexplained departure from prior agency determinations' is inherently arbitrary and capricious in violation of APA § 706(2)(A)."  *National Treasury Employees Union v. Federal Labor Relations Auth.*, 404 F.3d 454, 457 (D.C. Cir. 2005) (quoting *American Fed'n of Gov't Employees, Local 2761 v. FLRA*, 866 F.2d 1443, 1446 (D.C. Cir. 1989)).  The Supreme Court has expressly stated that "[u]nexplained inconsistency is ... a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act."  *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (noting an "agency's duty to explain its departure from prior norms").

Thus, while

> [a]n agency is free ... to change its standards[,] ... [t]he Supreme Court has made clear that when an agency changes its standard or rule, it is "obligated to supply a reasoned analysis for the change."  If an agency without explanation were to make an adjudication which is not consistent with the agency's previously established standards, the troubling question would arise whether the agency has lawfully changed its standard, or whether it has arbitrarily failed to adhere to its standard, which it may not lawfully do.

*Fox Television Stations*, 489 F.3d at 470 (quoting *State Farm*, 463 U.S. at 42) (footnote omitted).

Accordingly, the Second Circuit has ruled that "an agency ... cannot simply adopt inconsistent positions without presenting 'some reasoned analysis.'"  *Huntington Hosp. v.*

*Thompson*, 319 F.3d 74, 79 (2$^d$ Cir. 2003). "Such explanation, [the court] ha[s] said, is necessary so that the reviewing court may 'be able to understand the basis of the agency's action so that it may judge the consistency of that action with the agency's mandate.'" *Fox Television*, 489 F.3d at 470 (quoting *Mr. Sprout, Inc. v. United States*, 8 F.3d 118, 129 (2$^d$ Cir. 1993)). *See also Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003) (stating that an agency's "failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making" and that in changing course, an agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored") (quotation marks omitted); *see*, *e.g.*, *National Treasury Employees Union*, 404 F.3d at 457-58 (observing that agency's "failure to follow its own well-established precedent without explanation is the very essence of arbitrariness").

## II. Application to this Case

Applying these principles to the case at bar, I find that FTA's October 12 decision, to the extent that it found that RGRTA's proposed Express Service routes would not constitute valid tripper service and would violate the statutory and regulatory school bus prohibitions, was arbitrary and capricious, and must be set aside. The other decisions of July 30 and October 15 are essentially moot since the RGRTA no longer seeks to implement the service at issue there.

In reaching its decision of October 12, FTA improperly relied on factors–particularly RGRTA's intent–that are not provided for in the governing statute or regulations. In fact, the subjective test that FTA appears to have adopted in this case for determining whether RGRTA's proposed service would constitute tripper service is directly contrary in some respects to the

definition of "tripper service" set forth in FTA's own regulations, which focus on objective characteristics of the service in question, such as its availability to the general public.  In addition, some aspects of FTA's decision appear to be inconsistent with its own past rulings concerning some of the relevant issues here, and FTA has failed to explain its reasons for departing from the standards and reasoning applied in those prior decisions.

As stated, the governing statute, § 5323(f), prohibits federal financial assistance for public transportation unless the applicant agrees not to provide "schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator."  The regulations carve out an exception to that prohibition for "tripper service," which is defined as "regularly scheduled mass transportation service which is open to the public, and which is designed or modified to accommodate the needs of school students and personnel, using various fare collections or subsidy systems."  49 C.F.R. § 605.3.  In addition, "[b]uses used in tripper service must be clearly marked as open to the public," cannot carry "school bus" designations or similar markings, must stop only at the operator's "regular service stops," and may only travel along routes that are within the operator's "regular route service as indicated in [its] published route schedules." *Id.*

A commonsense reading of these provisions suggests several principles.  First, the plain language of the statute, § 5323(f), indicates that it only prohibits service that, *inter alia*, "*exclusively* transports students and school personnel ... ."  *See Lehman v. Burnley*, 866 F.2d 33, 36 (2[d] Cir. 1989) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be

regarded as conclusive") (quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)).

In the case at bar, the bus service at issue here does not "exclusively" transport students and school personnel. As stated, all of the routes at issue, both existing and proposed, are or would be open to the general public, and the buses used on those routes would not bear any markings designating them as school buses.

I recognize that with respect to the service that was the subject of FTA's July 30, 2007 decision, there were aspects of that service suggesting that it was less than fully available to the public at large. For example, FTA noted that in general, the routes at issue had no stops within 1.5 miles of the destination school, because RCSD receives no state subsidies for busing students who live within a mile and a half of their school. (A. 8-9.) RGRTA had previously admitted to FTA that it was going to discontinue certain routes that had been serving students living within 1.5 miles of Jefferson because "[w]ithout that subsidy, operating the routes is not economically feasible for RGRTA." Dkt. #8 Ex. O. In addition, in its January 18, 2007 decision, FTA found that "[t]here would be no means by which a member of the general public would know on which date the bus [on a certain route] was going to return at a different early dismissal time if they were only referring to the [RGRTA] Schedule Book." (A. 39.)[7]

Those deficiencies, however, appear to have been remedied by RGRTA's Express Service proposal. For example, under that proposal, Express Service "buses w[ould] stop at every stop on

---

[7]Although, strictly speaking, the January 18 decision is not directly at issue in this litigation, the July 30 decision states that it "supplements FTA's Decision of January 18, 2007." (A. 6.) Since the July 30 decision has been presented to this Court for review, the January 18 decision remains relevant.

the routes, including all stops within 1.5 miles of the school." Dkt. #52-2 at 6.  In addition, Express Service buses would "operate ... on all weekdays, including weekdays when school is not in session."  Dkt. #52-2 at 4.  RGRTA also proposed to revise its printed schedules to make them contain full and accurate schedules and maps for Express Service.  *Id.* at 5.  Given those proposals, it is difficult to see how FTA could reasonably have concluded that RGRTA's proposal would *exclusively* transport students and school personnel.

In fact, in its October 12, 2007 decision, which rejected RGRTA's Express Service proposal, FTA did not even explicitly address the "exclusive" component of the § 5323(f) ban on subsidies for school bus transportation.  *See* A. 12-18.  FTA instead focused on its finding that RGRTA had "designed the routes to meet the needs of the Rochester City School District ..., not the general public."  (A. 14.)  In other words, the agency focused on the subjective *intent* behind the proposed routes–specifically, RGRTA's intent to service students–rather than whether the routes would in fact be available to the general public.

I see no basis in the statute for such an approach.  To the contrary, the Court of Appeals for the Seventh Circuit has stated that a municipal bus company like RGRTA

> may *completely redesign* its transit system to accommodate school children as long as all routes are accessible to the public and the public is kept informed of route changes.  Public transit authorities ... design their systems to best meet the transit demands of the community.  If [the transit authority] knew, for example, that many workers in a factory district lived in a particular neighborhood, [it] would presumably design routes to better move the workers between the factories and their homes.  [The transit authority] can, of course, do the same thing to accommodate students.

*United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) (emphasis

added).[8]  *Lamers* makes clear, then, that as long as the service is, from an objective standpoint,

genuinely open to the public, it is not "exclusive school bus service," and is therefore not

prohibited.  FTA's focus on the underlying *purpose* behind the service would effectively read the

word "exclusively" out of the statute.  This it may not do.  *See Bowsher v. Merck & Co.*, 460 U.S.

824, 833 (1983) (applying the "settled principle of statutory construction that we must give effect,

if possible, to every word of the statute"); *United States v. Mitchell*, 502 F.3d 931, 948 (9th Cir.

2007) (referring to "the basic canon of statutory construction that qualifying language should not

be read out of the statute").

       FTA's conclusion that RGRTA's proposed Express Service would not meet the definition

of "tripper service" set forth in the regulations is also contrary to that definition.  Although FTA's

interpretation of its regulations is entitled to some deference, that deference "'cannot be allowed to

slip into judicial inertia' nor should this deference be permitted to turn reviewing courts into mere

'rubber stamps' for unbridled exercise of agency license."  *N.L.R.B. Union, Local 6 v. Federal

Labor Relations Auth.*, 842 F.2d 483, 487 (D.C. Cir. 1988).  Rather, "[w]here the plain language of

a regulation is clear, '[the Court] cannot torture the language to reach the result the agency

wishes.'"  *Via Christi Regional Med. Ctr., Inc. v. Leavitt*, ___ F.3d ___, 2007 WL 4285165, at *12

---

[8]Although FTA, Laidlaw and the Union attempt to distinguish *Lamers* on the ground that
it was a *qui tam* action in which the issue was whether the defendant city had knowingly made a
false or fraudulent statement, I see that as a distinction without a difference.  There is no reason
to think that the Seventh Circuit would have reached a different conclusion had it been asked to
review an FTA decision invalidating certain bus routes under the school bus prohibition of §
5323(f).

(10th Cir. Dec. 7, 2007) (quoting *Aspenwood Inv. Co. v. Martinez*, 355 F.3d 1256, 1261 (10th Cir. 2004)).  Of course, the agency cannot ignore or "torture" the regulatory language either.

In effect, the definition of "tripper service" simply defines what is *not* prohibited by the statute; whereas the statute *prohibits* funding to any operator of a service that "exclusively transports students and school personnel in competition with a private schoolbus operator," the regulations speak in terms of what is *allowed*. If one meets that definition, the service is permissible.

Specifically, to constitute "tripper service," the service in question must be (1) "regularly scheduled" (2) "mass transportation service" (3) "which is open to the public," and (4) "which is designed or modified to accommodate the needs of school students and personnel, using various fare collections or subsidy systems."  49 C.F.R. § 605.3.

There seems to be no dispute here that the proposed Express Service routes would be "regularly scheduled."  FTA's October 12, 2007 decision (which stated that "RGRTA has met some of the indicia of tripper service," A. 14) did not find otherwise.

The October 12 decision did not expressly discuss whether the proposed Express Service routes constituted "mass transportation service."  In its July 30 decision, however, FTA addressed at some length "the question of what constitutes 'mass transportation' or 'public transportation.'"[9] (A. 6.)  FTA began by correctly noting the statutory definition of that term as "transportation by a conveyance that provides regular and continuing general or special transportation to the public, but

_____

[9]In 2005, Congress amended Chapter 53 of Title 49 to replace the term "mass transportation" with "public transportation."  *See* 49 U.S.C. §§ 5302(a)(7), 5302(a)(10).

does not include schoolbus, charter, or intercity bus transportation or intercity passenger rail transportation ... ."  (A. 7) (citing 49 U.S.C. § 5302(a)(10)).

FTA then went on to explain why, in its view, RGRTA's service at issue was not "public transportation."  In its analysis, FTA explained that it "look[ed] at the *purpose* behind the service as well as the characteristics of the service to determine whether the routes are indeed public transportation."  (A. 7) (emphasis added).  Similarly, FTA stated that "[t]o determine whether service is public transportation, FTA considers the *intent* of the grantee as demonstrated by the effort undertaken to make schedules accurate and available to the general public," *id.* (emphasis added), finding that RGRTA's "lack of public outreach in publishing an accurate schedule is one more indicia that the service is not public in nature and, therefore, not public transportation."  *Id.* FTA also stated that it "consider[ed] whether the service is under the control of the recipient," and found that the routes at issue "[we]re developed at RCSD's request and that it is RCSD that essentially determines whether service is necessary."  (A. 8) (footnote omitted).

The FTA's July 30 decision, which concerned RGRTA's "triple digit routes" created in connection with the Subsidy Agreement between RGRTA and RCSD, is entitled to some deference by this Court. I note, though, that the FTA's July 30 decision failed to address RGRTA's citation (A. 60) of FTA's prior statements concerning "public transportation" in *American Bus Ass'n v. RGRTA*, No. 2006-12 (FTA Oct. 5, 2006).  In *American Bus Ass'n*, which concerned a complaint alleging that RGRTA's bus routes carrying passengers to and from a golf tournament constituted impermissible charter service, FTA concluded that the challenged service was public transportation and not charter service.  In reaching that conclusion, FTA stated that

> it is clear that the service is designed to benefit that portion of the public interested in going to the annual golf tournament.  However, the service is designed so that any member of the public wanting to travel along that route is able to board.  Prior FTA decisions have found that a subset of the general public is still considered to be the public at large for public (mass) transportation purposes.

Dkt. #8-3 at 4.  Although FTA made no explicit findings in its October 12 decision concerning whether RGRTA's proposed Express Service would constitute public transportation, the reasoning of its decision in *American Bus Ass'n* would certainly seem to support the view that it would.

If the July 30 decision were the only one before me, it might be adequate to defeat RGRTA's claim.  As stated, though, FTA did not make similar findings in its October 12 decision with respect to RGRTA's Express Service proposal, which involves new, different routes from those at issue in the July 30 decision, and which appears to have addressed the deficiencies identified by FTA in that prior decision.

Tripper service must also be "open to the public."  49 C.F.R. § 605.3.  Again, FTA's October 12 decision did not expressly address this issue with respect to RGRTA's Express Service proposal, focusing instead on its conclusion that the proposed routes were "not generally *designed* for the public," and that "[t]he *demand* for this service comes from RCSD, not the general public." (A. 16) (emphases added) (footnote omitted).  RGRTA's underlying motivation in designing the system, however, or what prompted RGRTA to propose the routes in the first place, is not determinative.  In relying on those factors, FTA effectively defined "open to the public" to mean "designed for the public, in response to general public demand."  That definition has no foundation in the relevant statute or regulations, and was arbitrary and capricious.

Tellingly, in its October 12 decision, FTA wrote, "As we have stated previously, FTA's tripper service rule is intended to prevent Federally-subsidized public transportation systems from operating special routes for school children, not generally designed for the public."  (A. 16).  In support of that assertion, FTA cited an earlier notice issued by FTA's predecessor, the Urban Mass Transportation Administration ("UMTA"), accompanying the issuance of the school bus regulations in 1976.  What UMTA actually said in that notice, however, is that "[f]ederally-assisted buses must remain open to the public at all times and be clearly marked for public use.  This requirement was added to prevent federally-assisted operators from operating special routes for schoolchildren *which are not generally available to the public*."  41 Fed. Reg. 14127 (emphasis added).  UMTA did *not* state, then, that routes must be generally *designed* for the public, but that they must be generally *available* to the public.  The clear import is that the agency sought to prohibit subsidized operators from running buses for schoolchildren from which other members of the public are excluded.  That is not what RGRTA has proposed to do here.  *See Alaska Trojan Partnership v. Gutierrez*, 425 F.3d 620, 627 (9th Cir. 2005) (reviewing court "must defer to the [agency's] interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency administrator's] intent at the time of the regulation's promulgation") (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)) (additional internal quotation marks omitted); *see, e.g.*, *Via Christi Regional Med. Ctr.*, ___ F.3d at ___, 2007 WL 4285165, at *13 ("both the 'plain language' and the 'indications of the Secretary's intent at the time of the regulation's promulgation' preclude the Secretary's current interpretation of [the regulation]").

The regulation also provides that to qualify as tripper service, the service in question must be "designed or modified to accommodate the needs of school students and personnel, using various fare collection or subsidy systems."  Even with respect to the "triple digit" routes at issue in FTA's earlier decisions, there appears to be no dispute that the latter half of this criterion has been satisfied; in its January 18, 2007 decision, FTA stated that RGRTA's agreement to allow students with valid RCSD identification cards to board its buses without paying, in exchange for RCSD's payment of a subsidy to RGRTA, "is not a violation of the school bus regulations."  (A. 38.)

With respect to the "designed or modified" prong, FTA stated in its October 12 decision that "transit systems may not design an entire service around students, and then merely 'accommodate' the general public ... ."  (A. 13.)  In support of that assertion, FTA quoted from its prior decision in *Tripper Operations, Erie Metro. Transit Auth., Erie, Pennsylvania* (FTA Apr. 13, 1989), that

> [r]ead narrowly, "modification of regularly scheduled mass transportation service to accommodate the needs of school students and personnel" means using different fare collections and subsidy systems.  In practice, "modification of mass transportation service" has been broadened to include *minor* modifications in route or frequency of scheduling to accommodate the extra passengers that may be expected to use particular routes at particular times of the day.  However, it was not intended that grantees operate a completely separate service for school children as appears to be the case in Erie.

(A. 13-14) (alteration in original).  FTA stated in its October 12 decision that RGRTA's proposed Express Service routes "hardly constitute 'minor modifications' to RGRTA's service, and RGRTA has designed the routes to 'substitute' for other school bus service in Rochester, in direct contravention of FTA's requirements."  (A. 14.)

FTA's assertion that a grantee may not design a system around students is, however, directly contrary to the Seventh Circuit's statement in *Lamers* that a grantee "may *completely redesign* its transit system to accommodate school children as long as all routes are accessible to the public and the public is kept informed of route changes."  168 F.3d at 1019.  In addition, FTA's exclusive focus on the "modification" aspect completely ignores the statement in § 605.3 that the service may also be "designed" to accommodate students.  The FTA appears to be selectively interpreting its regulations.

Moreover, in *Erie*, FTA was clearly attempting to distinguish between simply *modifying* a service and creating a "completely separate service" for students, to the virtual exclusion of the general public, as had been done in Erie, where the transit authority's purported tripper service used buses with "large flip-up signs" marked "CAUTION THIS BUS CARRIES SCHOOL CHILDREN," signs on the front and side stating "school special," and flashing red and amber lights mounted on top.  In addition, although the "tripper" buses stopped at regular bus stops, the bus stop signs only indicated which regular routes stopped there, with no indication that the stops were also used on tripper routes.  Given these facts, FTA questioned whether members of the general public would know that they were even allowed to ride the tripper buses, adding that "[s]hort of painting the buses yellow and black, EMTA has done everything possible to indicate that the buses are school buses."  Dkt. #116 Ex. E.  Although FTA stated in its October 12 decision that it did not mean to "suggest that RGRTA's proposal mirrors the particular service at issue in Erie," (A. 14), its conclusion that the Express Service proposal was not an acceptable modification

of a public transportation service to accommodate the needs of school students and personnel goes

far beyond its interpretation of the "modification" factor in *Erie*.[10]

With respect to the remaining requirements for tripper service, there appears to be no

dispute that RGRTA's buses operating on the routes in question are or would be "clearly marked as

open to the public," and that they would not bear "school bus" designations or similar markings.  In

its Express Service proposal, RGRTA stated that Express Service buses would have destination

signs such as "2X to 8 East Main – EXP – No Downtown," indicating that the bus runs along the

#2 and #8 routes, and bypasses downtown.  Dkt. #52-2 at 4.[11]  There was no suggestion that the

buses would be in any way marked as school buses.

The final regulatory requirements for tripper service are that buses may only stop at the

operator's "regular service stops," using routes that are within the operator's "regular route service

---

[10]FTA also noted that the Express Service proposal represented a departure from
RGRTA's traditional "hub and spoke" system, in which Main Street in downtown Rochester
serves as a hub for most of RGRTA's bus routes, to and from which buses travel along various
routes ("spokes") around the Rochester area.  (A. 14-15.)  Express Service buses would bypass
downtown altogether, traveling along portions of existing routes linked via the Inner Loop.

Although FTA took note of it, the fact that the new system would not operate on a hub-
and-spoke model does not seem to have been a major reason for FTA's rejection of the proposal.
In any event, I find this fact to be of little significance.  RGRTA has never disputed that the
Express Service routes were designed based on an analysis of "where the potential new
customers live and where they would be going," and that for a number of reasons, RGRTA
concluded that it would be undesirable or impracticable to integrate those routes into the hub-
and-spoke model.  (A. 116.)  I see no basis to conclude from those facts that the Express Service
proposal, would be anything other than a "modification" of the existing system.  Even if it were a
"complete[] redesign" of the system, though, that would not run afoul of the school bus statute or
regulations, provided that the new service was available to the public.  *See Lamers*, 168 F.3d at
1019 (noting that public transit authorities are free to "design their systems to best meet the
transit demands of the community").

[11]In contrast, the non-express #2 bus would have a destination sign reading, "2 to Main &
Clinton," indicating that route for that bus terminates at Main Street and Clinton Avenue in
downtown Rochester.  Dkt. #52-2 at 4.

as indicated in [its] published route schedules."  49 C.F.R. § 605.3.  Again, it appears that

RGRTA's Express Service proposal would satisfy those criteria, and FTA did not cite lack of

compliance with these requirements as a reason for its rejection of RGRTA's Express Service

proposal.  *See* Oct. 12, 2007 FTA Decision (A. 12-18); *cf.* July 30, 2007 FTA Decision (A. 9)

(stating that "RGRTA's purported 'tripper service' routes do not follow the same routes as regular

RGRTA routes").  As stated, the proposed service would utilize existing routes, by combining

portions of those routes, connected via the Inner Loop.  The buses would also stop at all bus stops

along the route, including stops within 1.5 miles of the destination school.

RGRTA did propose to "have some of the buses pull onto school property to discharge and

pickup passengers."  Dkt. #52-2 at 5.  FTA has previously noted, however, that "[i]t is permissible

to have a stop on school property so long as it is obviously accessible to the public."  Jan. 18, 2007

FTA Decision (A. 39).  In that regard, RGRTA stated that on each route with a stop on school

property, RGRTA would install a bus stop sign on the school property, and a sign on the adjacent

street indicating the location of the bus stop on school property.  Dkt. #52-2 at 5.  RGRTA also

stated that if the bus were continuing beyond the school, it would also stop on the street adjacent to

the school, and that if the bus's route terminated at the school, passengers wishing to go beyond the

school would be entitled to courtesy passes allowing them to transfer to a bus that stopped on the

adjacent street and continued beyond the school.  *Id.*  Again, FTA expressed no dissatisfaction with

those aspects of RGRTA's proposal.

I also note that FTA's decision appears to be at odds with some of its own prior rulings and

statements concerning school bus and tripper service.  In 1982, for example, FTA's predecessor,

UMTA, issued an advance notice of proposed rulemaking, seeking public comment on certain

changes that it proposed to make to the regulations concerning school bus operations.   One of the

proposals was to add a provision defining the term "exclusive school bus service."   FTA stated that

under this approach (which would have "define[d] what is not allowed, i.e., 'exclusive school bus

service," rather than what is allowed, *i.e.*, "tripper service"), the definition of "exclusive school bus

service" would include six factors:

> First, students and school personnel are the only passengers allowed.  Second, the bus
> service only takes students and school personnel to and from school.  Third, the route's
> origin and destination is a school.  Fourth, the service operates only during school hours
> and the school year.  Fifth, the bus carries a sign indicating that it is a "school bus."  Sixth,
> the school bus routes are not part of the recipient's scheduled service.

47 Fed. Reg. 44795-01, 44804 (UMTA Oct. 12, 1982).   Ultimately, FTA decided to withdraw the

proposed rulemaking as unnecessary, stating that based on the comments that it had received, it

appeared that "the proposed amendments to the regulation were merely clarifying in nature ... ."  70

Fed. Reg. 4081-01, 4082 (FTA Jan. 28, 2005).

Since the proposed changes were never adopted, they do not have the force of law, but they

are nevertheless indicative of what FTA has understood to constitute "exclusive school bus

service."  In withdrawing the proposed rulemaking, FTA never indicated that it found the proposed

definition in any way inaccurate, incomplete, or otherwise unsatisfactory.  Instead, FTA simply

stated that a formal definition appeared to be unneeded, because there did not appear to be any

confusion among the public about what was meant by the term "exclusive school bus service."  *Id.*

FTA's July 30 decision expressly cited the notice of proposed rulemaking as support for its

conclusion that the RGRTA routes at issue in that decision constituted exclusive school bus

service.  After reciting the six criteria set forth in the proposed definition, FTA stated that "[f]rom

these [six] factors, it is clear that 'exclusive' does not mean that if one or more members of the public are capable of riding a bus, then the service would not be exclusive."  (A. 10.)

It is certainly debatable whether that conclusion by FTA reasonably follows from the proposed six-factor test.  The very first characteristic of "exclusive" school bus service set forth in the proposed definition is that "students and school personnel are the *only* passengers *allowed*."  It is difficult to square that categorical statement with FTA's apparent view in this case that some unspecified threshold number of members of the general public must not only be allowed to, but actually do, use the service for it not to be "exclusive."  *See* July 30 Decision (A. 11) (stating with respect to RGRTA's assertion that 6570 non-student fare-paying passengers had used its purported tripper service from September 2006 through January 2007, *see* A. 68, that this failed to demonstrate that the service was not exclusive, since that number "represent[ed] an insignificant proportion of the riding passengers").  *Cf. United States ex rel. Lamers v. City of Green Bay*, 998 F.Supp. 971, 990-91 (E.D.Wis. 1998) (noting that FTA's regional counsel in that case, "whose job include[d] providing regulatory interpretation on behalf of the FTA," had stated that "FTA's position is that so long as the general public has *access* to that tripper service, that is not considered exclusive service that only serves the needs of one particular group and is, therefore, eligible for federal funding") (emphasis added), *aff'd*, 168 F.3d 1013 (7th Cir. 1999).[12]

_____

[12]In addition, although UMTA did suggest in its 1982 notice that a service might be considered "exclusive" based on fewer than all six of the enumerated factors, *see* 47 Fed. Reg. at 44804, FTA's July 30 decision simply ignored some of the other factors which would seem to weigh against a finding of exclusivity here, such as the fact that RGRTA's buses would not carry any "school bus" signs or similar markings.

I also note that while the 1982 proposed rulemaking notice was not mentioned at all in FTA's October 12 decision, the Express Service at issue there appears to be subject to even fewer of the proposed criteria for finding the service to constitute "exclusive school bus service" than

(continued...)

FTA's decisions in this case have also contradicted its prior expressed views of what it means for transportation service to be "open to the public."  In *Travelways, Inc. v. Broome County Dep't of Transp.* (UMTA Dec. 4, 1985), which FTA cited in its July 30 decision, *see* A. 9, the agency ruled on a complaint alleging that the respondent was engaging in prohibited school bus operations.  Discussing whether the challenged service was "open to the public," UMTA stated that

> [i]n order to satisfy the criterion of "open to the public," it is only necessary that the buses be available to the general public; *the volume or level of public (non-school ) use is not controlling*.  However, it is necessary to ascertain from the operator's circumstances whether or not the service is, in fact, open to the public, i.e., could members of the general public use the tripper service if they so desired?

(A. 146) (emphasis added).[13]  Although FTA cited *Broome County* in its July 30 decision, it failed to mention this seemingly significant statement, or to explain why the agency appeared to be taking a different position with respect to RGRTA's service.[14]

_____

[12](...continued)
the routes that were the subject of the July 30 decision.  Express Service buses, for example, would run on weekdays even when school was not in session.  Dkt. #52-2 at 4.

[13]UMTA went on to find that the challenged service was not sufficiently open to the public, because drivers on the tripper buses would typically advise non-student passengers waiting to board the bus that the bus would be carrying a number of school students and that another bus not transporting students would be following shortly.  (A. 145.)  UMTA stated that such a statement by the driver would be "too susceptible to interpretation by the non-student population as, 'Do not board.  Students only.'" (A. 146.)

[14]FTA's citation of *Broome County* in its July 30 decision was limited to the statement in *Broome County* that a "familiar [and acceptable] type of [route] modification would be where the route deviates from its regular path and makes a loop to a school returning back to the point of deviation to complete the path unaltered."  (A. 144.)  FTA stated in its July 30 decision that "RGRTA's school-designed routes do not fit this description; however, even such a modification to rejoin a route would not transform this service into public transportation since its overall form and substance defeats the purpose of the school bus regulation."  (A. 9.)  In so ruling, FTA appears again to have improperly made RGRTA's intent determinative.
    In addition, to the extent that FTA may have read *Broome County* as implying that *only*

(continued...)

As stated, an agency's failure to explain its departure from its own past precedents is reason enough to find the agency's action arbitrary and capricious under the APA. *National Cable & Telecomms. Ass'n*, 545 U.S. at 981; *see also State of Michigan v. Thomas*, 805 F.2d 176, 184 (6th Cir. 1986) ("An administrative agency may reexamine its prior decisions and may depart from its precedents provided the departure is explicitly and rationally justified"); *Woodstock v. Kempthorne*, 448 F.Supp.2d 382, 388 (E.D.N.Y. 2006) ("The Court may set aside an agency determination that is inconsistent with the agency's prior decisions and conduct if its reasons for its inconsistent conduct are not explained by the record"). In its decisions concerning RGRTA's service, FTA has taken positions that appear to be inconsistent with its own past pronouncements concerning school bus and tripper service. Its failure to provide a "reasoned explanation" for that apparent "flip-flop" warrants a finding that FTA's actions were arbitrary and capricious and that they cannot stand. *Fox Television Stations*, 489 F.3d at 457 (quoting *New York Council, Ass'n of Civilian Technicians v. FLRA*, 757 F.2d 502, 508 (2[d] Cir. 1985)).

---

[14](...continued)
such loop-like deviations are acceptable, that is clearly an overly expansive view of that decision. UMTA stated that "[t]here are many ways in which a transit authority can modify routes to accommodate the needs of students," and it cited "loop" deviations only as one "familiar" example. (A. 144.) The agency went on to find that Broome County's modifications (which included running one bus to a point part way along its published route and "expressing" to school from that point, and then beginning a second, empty bus from the point of express along the rest of the route) was consistent with the school bus regulations. (A. 145.) The agency thus had no occasion to consider any other types of route modifications, nor did it indicate what types of modifications or changes would be *im*permissible.

August 30, 2007 Decision Granting a Stay and Order

In its August 28, 2007 Decision and Order granting RGRTA's motion for a stay of FTA's July 30, 2007 decision, the Court stated that the stay was being "granted strictly to prevent irreparable harm to the students, their parents and others who rely on the bus service," and not because RGRTA had shown a likelihood of success on the merits.  506 F.Supp.2d at 210.  I also stated that "it d[id] not appear that the FTA's interpretation of the relevant regulations could fairly be described as 'plainly erroneous' or 'inconsistent with' those regulations," and that I "s[aw] little basis *at th[at] point* upon which the Court could set aside the FTA's decision." *Id.* at 212-13 (emphasis added).

The Court's August 28 Decision and Order, however, was issued upon a limited record, and was only addressed to FTA's July 30 decision, which concerned only the purported tripper routes that RGRTA was then operating.  Since that time, RGRTA has proposed entirely new, different routes as part of its Express Service proposal, and FTA has issued its October 12, 2007 decision rejecting that proposal.  In addition, the record before this Court has been substantially supplemented by both sides since my August 28 Decision and Order.

My prior decision, then, in no way binds the Court with respect to the motions now before me, which principally concern FTA's October 12 decision.[15]  *See Pitt News v. Pappert*, 379 F.3d 96, 105 (3d Cir. 2004) (where prior panel of court of appeals stopped at the question of appellant's likelihood of success, prior panel's legal analysis "must be carefully considered, but it is not

---

[15]FTA's October 15, 2007 decision did little more than reaffirm its July 30 decision, with reference to certain new RGRTA routes that shared all of the essential characteristics of the routes that were the subject of FTA's July 30 decision.  RGRTA's Express Service proposal was not at issue in the October 15 decision.

binding on the later panel" considering merits of appeal); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, No. 2:97-CV-67, 2002 WL 1592596, at *6 (W.D.Mich. July 9, 2002) (while court affirmed legal analysis contained in its earlier opinion denying preliminary injunctive relief, court was not bound by factual findings in that opinion, and would "reconsider the equities in light of Plaintiff's modified request for relief and the changes that have occurred subsequent to the Court's [prior] opinion").

Since RGRTA proposed the Express Service routes to supplant, rather than supplement, the service that was the subject of FTA's July 30 decision (as well as its January 18 and October 15 decisions), in order to rectify the problems identified by FTA in that decision, and since the Express Service proposal, and FTA's October 12 decision rejecting it, have become the focal point of the parties' arguments before this Court, RGRTA's claims seeking review of FTA's July 30 decision have effectively become moot.  Accordingly, my decision today is limited to concluding that FTA's October 12, 2007 decision, which found that RGRTA's proposed Express Service tripper routes would constitute impermissible school bus service, was arbitrary and capricious, and must be set aside.

Motions to Strike

FTA, Laidlaw and the Union have also filed motions to strike evidence outside the administrative record in this case pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, which provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Specifically, they have moved to strike certain documents submitted by RGRTA concerning bus operations in areas other than Rochester,

including Buffalo, Syracuse, and other cities both in New York and other states.  They have also

moved to strike:  the MOU between RGRTA, RCSD and Laidlaw; the affidavit of C. Michael

Robinson (Dkt. #16-3), the Chief Operating Officer of RCSD, which recites some of the details of

the relationship among the parties, including the circumstances surrounding the MOU; and the

1984 contract between RCSD and Laidlaw's predecessor, National School Bus Service, Inc.

Movants contend that the Court's review of FTA's decisions should be limited to the record that

was before the agency, which did not include any of these documents.

Review of agency action under the APA is generally "limited to examining the

administrative record to determine whether the [agency] decision was based on a consideration of

the relevant factors and whether there has been a clear error of judgment.'"  *Riverkeeper, Inc. v.*

*United States E.P.A.*, 358 F.3d 174, 184 (2ᵈ Cir. 2004) (quoting *Natural Res. Def. Council, Inc. v.*

*Muszynski*, 268 F.3d 91, 97 (2ᵈ Cir. 2001)) (additional internal quotation marks omitted).  Courts

have, however, carved out some exceptions to that rule, such as in circumstances where "admission

[of extra-record evidence] is necessary to determine 'whether the agency has considered all

relevant factors and has explained its decision' ... ."  *Northwest Environmental Advocates v.*

*National Marine Fisheries Service*, 460 F.3d 1125, 1145 (9ᵗʰ Cir. 2006) (quoting *Lands Council v.*

*Powell*, 395 F.3d 1019, 1030 (9ᵗʰ Cir. 2005)); *see also United States v. Akzo Coatings of America,*

*Inc.*, 949 F.2d 1409, 1427 (6ᵗʰ Cir. 1991) ("a reviewing court may consider materials

supplementary to the administrative record in order to determine the adequacy of the government

agency's decision, even when the court's scope of review is limited to the administrative record").

In addition, there is authority that a "district court may go outside the administrative record

for the purposes of background information ... ."  *Alvarado Community Hosp. v. Shalala*, 155 F.3d

1115, 1124 (9th Cir. 1998), *opinion amended on other grounds*, 166 F.3d 950 (9th Cir. 1999); *see also Akzo Coatings*, 949 F.2d at 1428 ("a reviewing court evaluating agency action on the administrative record may consider additional evidence as ... background information to aid the court's understanding"); *accord Empresa Cubana Exportadora de Alimentos y Productos Varios v. United States*, 516 F.Supp.2d 43, 54 (D.D.C. 2007); *Buffalo Cent. Terminal v. United States*, 886 F.Supp. 1031, 1045-46 (W.D.N.Y. 1995) ("One exception to this rule [against considering extra-record material] is that the court is permitted to go outside of the administrative record to consider background evidence to clarify the information before the agency at the time of its decision").

In the case at bar, I find that evidence concerning bus operations in localities other than Rochester, which was not presented to FTA in the administrative proceedings in this case, does not fall within any of the exceptions to the rule against consideration of evidence outside the administrative record. Although RGRTA contends that this evidence demonstrates that FTA has treated other transportation authorities differently from the way that it has treated RGRTA, the mere fact that other transportation authorities provide certain types of service is not sufficiently probative of *FTA's* practices to justify the Court's consideration of them in reviewing FTA's decisions concerning RGRTA.

As the Court has stated, an agency does have an obligation to explain its reasons for departing from its own precedent. "A deviation from prior interpretations without sufficient explanation may be considered arbitrary and capricious and therefore subject to judicial reversal." *Harrington v. Chao*, 280 F.3d 50, 58 (1st Cir. 2002) (citing *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)). Evidence that other public transportation authorities have been operating certain types of bus routes, however, absent some FTA rulings addressing the propriety of those routes in the

context of adversarial proceedings, does not in itself carry any precedential value. *See Rendleman v. Shalala*, 21 F.3d 957, 961 n. 5 (9th Cir. 1994) ("the extra-record materials submitted by Rendleman do not establish a 'settled' precedent contrary to the result in this case") (citing *Atchison, Topeka & Santa Fe*, 412 U.S. at 805-08).

The Court has considered evidence concerning the MOU (the authenticity of which is not disputed), but only for purposes of understanding and explaining the background of this case. As stated, it is generally permissible to use extra-record evidence for such purposes. *See Sadler v. Mineta*, No. 3:05-CV-1189, 2006 WL 2772699, at *2 n. 3 (D.Conn. Sept. 26, 2006) (stating that court would look to evidence outside administrative record "as general background information that clarifies the administrative record in assessing Plaintiffs' claim," and noting that "no party has contested" the information contained in the evidence); *In re Guardianship and Conservatorship of Blunt*, 358 F.Supp.2d 882, 893 (D.N.D. 2005) ("courts have held that consideration of after-the-fact affidavits or testimony is sometimes necessary for background purposes"). The Court has not, however, relied on the MOU in reaching its decision in this case.[16]

Although the Court has not considered any of the evidence concerning the practices of transit authorities other than RGRTA, I will deny the motions to strike this evidence. "Generally, motions to strike are disfavored and will be denied unless the allegations have 'no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.'" *Bank of Beaver City v. Branham*, No. 3:03-CV-575, 2006 WL 1469300, at *4 (E.D.Tenn. May 24, 2006) (quoting 5C Charles A.

---

[16]The Court has not considered, even for background purposes, the 1984 contract between RCSD and National School Bus Service, Inc.

Wright & Arthur R. Miller, Federal Practice & Procedure § 1382 (3d ed. 2004)).  "While courts possess considerable discretion in weighing Rule 12(f) motions, such motions are not favored and will generally be denied unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party."  *Miller v. Group Voyagers, Inc.*, 912 F.Supp. 164, 168 (E.D.Pa. 1996).  *See also Eldorado Stone, LLC v. Renaissance Stone, Inc.*, No. 04CV2562, 2006 WL 4569360, at *5 (S.D.Cal. Feb. 6, 2006) ("To succeed on a motion to strike, one must demonstrate that no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the complaint, and that to permit the allegations to stand would result in prejudice to the movant").  Since this evidence has played no part in the Court's decision, I see no prejudice to FTA, Laidlaw, or the Union simply from the existence of this evidence in the record in this case.  *See Colabufo v. Continental Cas. Co.*, No. 04-CV-1863, 2006 WL 1210919, at *6-*7 (E.D.N.Y. Apr. 27, 2006); *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, No. 97 CIV. 6124, 1999 WL 307666, at *19 (S.D.N.Y. May 17, 1999), *aff'd*, 199 F.3d 94 (2[d] Cir. 1999).[17]

---

[17]I also note that there is authority that Rule 12(f) does not apply to affidavits and similar materials submitted in connection with a motion for summary judgment, since by its terms Rule 12(f) only applies to "pleadings."  *See, e.g.*, *Turner v. City of Akron*, No. 5:06CV3023, 2008 WL 45376, at *4 (N.D.Ohio Jan. 2, 2008); *Dragon v. I.C. System, Inc.*, 241 F.R.D. 424, 425-26 (D.Conn. 2007); *Baptisto v. Ryan*, No. CV031393, 2005 WL 2416356, at *3 (D.Ariz. Sept. 30, 2005); *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Hicks, Muse, Tate & Furst, Inc.*, No. 02 Civ. 1334, 2002 WL 1482625, at *6 (S.D.N.Y. July 10, 2002); *Walker v. Cox*, No. 95 CV 1219, 1997 WL 177854, at *5 (E.D.N.Y. Mar. 27, 1997).  *See also* Fed. R. Civ. P. 7(a) (stating that the only "pleadings" allowed are a complaint, an answer to a complaint, an answer to a counterclaim designated as a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and if the court orders one, a reply to an answer).

Summary

In sum, FTA went beyond simply "interpreting" the regulation concerning tripper service; it effectively rewrote the regulation. Although RGRTA's Express Service proposal appeared to meet all of the objective criteria for permissible tripper service, FTA nevertheless found it impermissible because of RGRTA's *intent* in designing the service. That is simply not a relevant factor under § 605.3.[18]

In fact, the regulation appears to *presume* some intent on the part of the recipient to serve school students, since it defines "tripper service" as "service ... which is *designed* or modified to accommodate the needs of school students and personnel ... ." 49 C.F.R. § 605.3. It is difficult to see how a service could be "designed" to accommodate students' needs without simultaneously *intending* to accommodate those needs. By proscribing such intent, then, FTA improperly departed from the plain meaning of that regulation. If FTA wishes to add an element of intent to the definition of "tripper service" it may seek to do so by promulgating a new, amended regulation, not

---

[18]A further illustration of FTA's focus on RGRTA's intent, irrespective of the objective aspects of the proposed service, is contained in footnote 4 of FTA's October 12 decision, where it notes that

> RGRTA has offered to have the morning buses continue past the school and the afternoon buses start service before the school, even though RGRTA has stated there would be no demand for this, if FTA were to find this necessary to comply with our tripper service requirements. This would not change the fundamental nature and purpose of the service. For FTA, this is not an exercise in dotting the "i"s or crossing the "t"s to make a service superficially compliant with our requirements.

(A. 16.) It appears, then, that in FTA's view, no matter how fully RGRTA's proposed service might have satisfied all of the objective criteria for tripper service set forth in the regulations (which is to say, *all* of the criteria, since none of the criteria contained in the regulations are anything other than objective), the proposed service would be nothing more than "superficially compliant" as long as the underlying purpose of the service was to transport school students.

by "interpreting" the regulation in a manner that is contrary to what it says.  *See Via Christi Regional Med. Ctr.*, ___ F.3d at ___, 2007 WL 4285165, at *12 ("If the [agency] wants to take a position that is inconsistent with existing regulations, then the [agency] must promulgate new regulations under the notice-and-comment provisions of the APA, 5 U.S.C. § 553") (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)).

I also note that FTA's October 12 decision relied heavily on the agency's understanding of Congress's intent when it enacted § 5323(f)'s prohibition of school bus service, and its belief that RGRTA's proposed Express Service would be contrary to that intent.  FTA stated that "Congress enacted Section 5323(f) to prevent unfair competition that would result from a transit system's use of Federal public transportation grants to compete with the private school bus industry."  (A. 14.)  In finding that RGRTA's proposal was inconsistent with that intent, FTA stated that RGRTA's proposed Express Service was "intended to substitute for school bus transportation previously provided by the private school bus industry" (A. 16), and that the service was part of "RGRTA's apparent attempt to systematically take over school bus service for Rochester's school district, to the detriment of the private school bus industry and its workers."  (A. 17.)  Because the service would "pick up students, take them to school, and return them home at the end of the day," FTA concluded that it "is the type of daily transportation to and from school that Section 5323(f) prohibits."  (A. 17.)[19]

_____

[19]Likewise, in its July 30 decision, FTA indicated that the real problem with what RGRTA was doing lay not simply with the failure of individual routes to meet the definition of "tripper service," but with the overall *scale* of the service at issue.  FTA stated that "[t]he sheer magnitude and number of routes that RGRTA is systematically taking over from private school bus providers ... and which are then subsidized by RCSD, demonstrates the nature of RGRTA's service."  (A. 10.)  FTA stated that RGRTA had undertaken "a massive displacement of the private school bus operator [that] amounts to exactly the type of daily competition to and from the schools which ... the statute was intended to prevent."  (A. 10.)

While Congressional intent is certainly a permissible consideration in interpreting a statute, there is a "strong presumption that the plain language of a statute expresses congressional intent unless a contrary legislative intent is clearly expressed." *Committee to Stop Airport Expansion v. F.A.A.*, 320 F.3d 285, 291 (2ᵈ Cir. 2003) (citing *Ardestani v. INS*, 502 U.S. 129, 135 (1991)).  In other words, the starting point should be the language of the statute, which, if clear and unambiguous, is presumed to express Congress's intent.  No further examination of intent is necessary.

FTA went far the clear language of the statute by inferring an overarching intent on the part of Congress to protect the school bus industry, and then relying on that inference to effectively broaden and rewrite the scope of the statute.  That was improper.  Congress may have been motivated by a *general* intent to protect private school bus operators from unfair competition from recipients of federal public-transportation funds, but it expressed that intent through a statute, § 5323(f), that is quite specific in its requirements:  it simply provides that a recipient of federal funds for public transportation must agree not to provide "schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." RGRTA's Express Service, as proposed, would not do so, for the reasons stated above.  FTA therefore acted arbitrarily and capriciously in rejecting that proposed service based on its perception of Congress's general intent to protect private school bus operators from unfair competition.

In short, FTA appears to have taken the position that if RGRTA intends to provide a service that would transport students to and from school, that alone would justify a finding that the service is barred by the applicable statute and regulations, regardless of whether the proposed service would meet the standards set forth in those provisions.  That view was reemphasized by the final paragraph of FTA's October 12 decision, where, after stating that it was "ready to meet with

- 45 -

RGRTA again to discuss proposed tripper service in the Rochester area," FTA was quick to add that such a meeting would be a waste of time for all concerned unless RGRTA was prepared to accept, "once and for all, ... its *inability as a matter of law* to start from the *premise* that it may design service exclusively for school students, in competition with the private sector, and then work from there to modify the service to meet FTA's requirements." (A. 18) (first emphasis added). For the reasons stated, I find that conclusion to be arbitrary and capricious, and not in accordance with law.

## CONCLUSION

At this point, however, RGRTA's proposed Express Service remains just that–a *proposed* service. Pursuant to the Court's stay order, RGRTA has presumably been continuing to operate the purported tripper routes that FTA found impermissible in its July 30 and October 15 decisions, and it seems unlikely that RGRTA could switch over to Express Service overnight. Furthermore, even if *RGRTA* could do so, RCSD students and their parents would certainly need some time to be made aware of and prepare for the coming changes in their bus service.

As indicated in my August 28, 2007 Decision and Order, one of the Court's chief concerns is to "avoid the potential chaos and disruption in the transportation of students that could ensue" from a precipitous alteration of RCSD students' bus service. 506 F.Supp.2d at 209 (adding that "the most important concern for the Court is the effective and orderly transportation of students to and from school"). To give RGRTA, RCSD, and the students of Rochester and their parents adequate time to implement and prepare for the changeover to Express Service, the Court will therefore extend the previously entered stay as set forth below.

Therefore, I rule as follows:

Petitioner Rochester-Genesee Regional Transportation Authority's motion for summary judgment (Dkt. #118), and intervenor Rochester City School District's Petition for Judicial Review (Dkt. #44) and its motion for summary judgment (Dkt. #122) are granted in part and denied in part. The Court finds that respondent Federal Transit Administration's October 12, 2007 decision is contrary to law and must be set aside pursuant to 5 U.S.C. § 706(2).  This includes any decision by the Agency to impose monetary sanctions.  In all other respects, those motions are denied as moot.

Respondent Federal Transit Administration's motion for summary judgment (Dkt. #113) and motions to strike (Dkt. #99 and #132) are denied.

Intervenor Laidlaw Transit, Inc.'s motion to strike (Dkt. #102), and Laidlaw Transit, Inc.'s and United Food and Commercial Workers District Local One's motion to strike (Dkt. #133), are denied.

The Court's previously entered stay, as modified, of the FTA's decision of July 30, 2007, is hereby extended until March 24, 2008 to afford RGRTA time to implement the service discussed in the FTA's October 12, 2007 decision (the Express Service).

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
         January 24, 2008.