UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROCHESTER-GENESEE REGIONAL
TRANSPORTATION AUTHORITY,

Plaintiff,

DECISION AND ORDER

07-CV-6378L

v.

BRIGID HYNES-CHERIN
as Regional Administrator for Region II of
the Federal Transit Administration, et al.,

Defendants.

On January 24, 2008, this Court issued a lengthy Decision and Order ("Decision")

granting summary judgment for the Rochester-Genesee Regional Transportation Authority

("RGRTA") and, thereby, reversed and vacated the appealed-from decision of the Federal Transit

Administration ("FTA"), which had prohibited certain bus services, on authority of 49 U.S.C.

§ 5323(f) and its implementing Regulations. Familiarity with that Decision and other

proceedings in the case are presumed. Although the FTA neglected or declined to appeal the

Court's Decision, the issues that occasioned the lawsuit are hardly moribund.

By letter dated September 15, 2008, (Exhibit "A" to this Decision but without its

exhibits), RGRTA requested that the Court provide "clarification" of certain aspects of the

Decision in order to assist RGRTA in its litigation over a grievance filed against it by a local

union representing RGRTA's bus drivers. By letters dated October 6, 2008 (Exhibit "B") and
October 8, 2008 (Exhibit "C"), the FTA and Laidlaw Transit, Inc. ("Laidlaw") opposed
RGRTA's request for the requested relief and clarification.

The Court must decline RGRTA's invitation to clarify its decision. The lengthy decision
stands; it was not appealed from by any party. But, more to the point, as the FTA and Laidlaw
point out, there is presently no live controversy before this Court. Federal courts are courts of
limited jurisdiction, responding only to "live" cases or controversies within the ambit of their
designated jurisdiction. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 621 n. 4 (1989); *Van Wie v.
Pataki*, 267 F.3d 109, 113 (2d Cir. 2001).

Furthermore, to grant the relief now requested, would be tantamount to rendering an
advisory opinion, something federal courts are especially loath–indeed, are not empowered–to
do. *See Prasco, LLC v. Medicis Pharmaceutical Corp.*, 537 F.3d 1329, 1338 n. 6 (Fed. Cir.
2008) ("Article III courts cannot issue advisory opinions"); *West Linn Corporate Park L.L.C. v.
City of West Linn*, 534 F.3d 1091, 1099 (9th Cir. 2008) ("federal courts are not permitted to
render advisory opinions"); *see also ABC, Inc. v. Stewart*, 360 F.3d 90, 97 (2d Cir. 2004) ("'if an
event occurs while a case is pending on appeal that makes it impossible for the court to grant any
effectual relief whatever to a prevailing party,' we must dismiss the case, rather than issue an
advisory opinion") (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)
(additional internal quotation marks omitted).

Although the Court initially considered attempting to work with all parties toward a
settlement, I have decided against it. The parties here have demonstrated little ability or

willingness to resolve their differences amicably, even when the transportation of thousands of students was in immediate jeopardy.

Therefore, RGRTA's request for clarification of the Court's January 24, 2008 Decision is denied.

IT IS SO ORDERED.

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
November 13, 2008.

- 3 -

EXHIBIT A



**HARRIS BEACH** PLLC

ATTORNEYS AT LAW

99 GARNSEY ROAD
PITTSFORD, NY 14534
(585) 419-8800

PHILIP G. SPELLANE
DIRECT:  (585) 419-8638
FACSIMILE: (585) 419-8811
PSPELLANE@HARRISBEACH.COM

DALE A. WORRALL
DIRECT: (585) 419-8620
FACSIMILE: (585) 419-8811
DWORRALL@HARRISBEACH.COM

September 15, 2008

Honorable David G. Larimer
United States District Judge
United States District Court for the Western District of New York
100 State Street
Rochester, New York 14614

      Re:    Rochester-Genesee Regional Transportation Authority vs. Hynes-Cherin and The
                Federal Transit Administration
                Civil No. 07-CIV-06378-DGL

Dear Judge Larimer:

As you may recall, our firm represents the Rochester-Genesee Regional Transportation Authority ("RGRTA"). We are writing to request clarification of your Decision and Order in the matter of Rochester-Genesee Regional Transportation Authority v. Hynes-Cherin (the "Decision & Order"). This clarification is necessary, among other reasons, to resolve a Grievance (the, "Grievance") that has been filed by a member of the Executive Board of the Amalgamated Transit Union Local 282 -- i.e., the Union that represents Regional Transit Service ("RTS") bus drivers.

**The Grievance.**

By its Grievance, the Union "requests that all RTS Express Transfer Service work and operate on all weekdays and, if not, operators assigned to them be made whole for lost time." In seeking that relief, the Union encourages a labor arbitrator to adopt what we believe to be an erroneous interpretation of your Decision and Order. For the convenience of the Court, a copy of the Grievance is attached hereto as Exhibit "A."

Specifically, the Union asks the labor arbitrator to find that, "based on FTA regulations modified by Judge Larimer's January 24, 2008 court decision in RGRTA v. Hynes-Cherin," Express Transfer Service ("ETS") routes are required by law to be operated every day, regardless of whether school is in session. The Grievance goes on to assert that, because RTS has stopped operating ETS on days that school is not in session, RTS is violating the law as interpreted by this Court in its Decision and Order. So, too, according to the Union, is RTS violating the parties' collective bargaining agreement.

Honorable David G. Larimer
September 15, 2008
Page 2


RGRTA believes that your Decision & Order does not require the operation of ETS on days that school is not in session, even though at the time the Decision & Order was issued RTS was planning to do so, and even though RTS did, in fact, do so through the end of the 2007-2008 school year.

**Points of Clarification.**

Clarification of your Decision & Order is necessary for three reasons: (1) RTS does not want to violate the Decision & Order and will immediately adjust its operations to ensure its full compliance; (2) this Court is in a much better position to interpret its own Decision & Order (as opposed to a labor arbitrator); and (3) clarification avoids the possibility of inconsistent interpretations of the regulations between this Court and the arbitrator.

Thus, RGRTA respectfully requests that this Court confirm the following three points:

1. The characteristics of ETS are sufficient to show that it falls within the definition of "tripper service" even if the service only operates on days that school is in session;

2. Provided RTS operates ETS in all other respects in conformity with its description as set forth in your Decision & Order, RTS will be providing permissible "tripper service;" and

3. The question of whether RTS is providing permissible "tripper service" does not turn on the question of whether it operates ETS on every day regardless of whether school is in session.

**Providing ETS only on the days that school is in session does not convert that service from being permissible tripper service into being impermissible schoolbus service.**

When RTS designed ETS and made a PowerPoint presentation of that proposed service to the Federal Transit Administration ("FTA"), RTS advised FTA that: (i) RTS anticipated that ETS would be very popular (which is why RTS intended to operate ETS even when school was not in session); (ii) RTS would adjust the number and identity of the routes serviced by ETS during the summer of 2008 "based on demand"; and (iii) RTS anticipated that the public benefits of ETS would result in considerable non-student demand for the service. For the convenience of the Court, attached as Exhibit "B" is a copy of three PowerPoint slides that were included in the presentation made to the FTA in an attempt to obtain its approval of ETS.

From the time that RTS began the ETS through the end of the 2007-2008 school year, ETS operated every weekday, including days that school was not in session. Although a considerable number of non-students took advantage of ETS, the demand was not as great as RTS had initially anticipated and hoped. As indicated in the PowerPoint presentation made to the FTA, when the 2007-2008 school year ended and summer arrived, the number of routes that offered ETS service was considerably reduced and ETS service was not offered on days that summer school was not in session. When school started again in September 2008, RTS decided to continue the summer-time practice of not offering the ETS option on days school was not in session, although the number of routes serviced by ETS increased to address the increased demand of students returning to school.

RTS' understanding of both the FTA decisions and your Decision & Order is that offering ETS only on the days that school is in session does not convert that service from being permissible tripper service into being impermissible schoolbus service. That understanding is based on the following:

A.     January 18, 2007 FTA Decision.

The FTA's first decision dated January 18, 2007 (attached as Exhibit C) discussed at length the requirement under the tripper service definition that the service be "regularly scheduled." That first FTA decision criticized the pre-ETS service provided by RTS on the basis that it was designed to operate at school opening time and school closing time and the printed schedule did not adequately state the dates on which the "early dismissal" times would be followed. The decision made no mention of the fact that the pre-ETS service provided by RTS operated only on school days.

B.     July 30, 2007 FTA Decision.

The FTA's second decision dated July 30, 2007 (attached as Exhibit D) also failed to attach any significance to the fact that the pre-ETS routes operated only on school days. On page 4, the FTA acknowledged that RGRTA "stated that it is typical to operate tripper service only on school days" and that RGRTA "acknowledged that, in future tripper service schedules, they would advertise that the service would operate only on school days to provide the public with an accurate schedule." On page 8, the FTA concluded that the pre-ETS routes did not meet the "regularly-scheduled" requirement of the tripper service regulations, not because they ran only on school days, but rather because of the "treatment these routes received in the RGRTA printed schedules in the RGRTA website schedules." The only such "treatment" that the decision references is the fact that RGRTA's printed schedules did not indicate the "early dismissal" days and the dates of school vacation when the routes would not be operated. The FTA implicitly acknowledged that routes need not be operated during the days of school vacation so long as the printed schedule accurately advises the general public of that fact.

Honorable David G. Larimer
September 15, 2008
Page 4

C.    This Court's Decision & Order.

The Grievance points to pages 22 and 23 of this Court's Decision & Order (attached as Exhibit E) as the basis for the Union's conclusion that the law mandates that tripper service operate on days that school is closed. RTS disagrees.

On page 22, your Honor was discussing the fact that the FTA had found that the RTS schedules did not provide the general public with the means by which to know on which date the bus on a certain route was going to return at a different early dismissal time or the dates on which the route was not going to operate because school was closed. The Decision & Order on pages 22-23 states that those deficiencies were remedied by ETS since the ETS buses would operate on all weekdays, including weekdays when school was not in session (i.e., there is no need to change the printed schedule to indicate the dates on which the service would not run due to school vacation) and because RTS was revising its printed schedules to make them contain full and accurate schedules and maps for ETS (i.e., RTS was going to specifically state on the printed schedule the dates on which the early dismissal times would be followed).

RTS did not interpret those statements in the Decision & Order as mandating that RTS forever operate ETS on days that school is not in session. Rather, RTS interpreted the findings as meaning that, if RTS is not going to offer ETS on days to school is not in session, the printed schedules must specifically give the dates on which ETS service will not be offered on a particular route. Attached as Exhibit F is a sample of an RTS printed schedule for a route with ETS service. In the table at the right under the heading "Special Travel Codes," there are codes stating the following:

• Code E - "Bus operates Wednesday only." Wednesday is early dismissal day for the Rochester City School District.

• Code P - "Bus operates Monday, Tuesday, Thursday and Friday only." Those are the regular dismissal days for the Rochester City School District.

• "ETS routes do not operate on the following days ..." The dates following that statement are the dates on which school is closed.

RTS believes that it has addressed the concerns of the FTA and the intent of the discussion on pages 22-23 of the Decision & Order.

Honorable David G. Larimer
September 15, 2008
Page 5

 

 

D.     FTA Proposed Interpretation.

Following the issuance of this Court's Decision & Order, the FTA published a proposed interpretation intended to nullify your Decision & Order throughout the United States except in the Western District of New York. A copy of that proposal is attached as Exhibit G. On page 28791 of that proposal, the FTA states that *a common permissible modification includes operating tripper service "only during school months, on school days, and during school and opening and closing periods* (Emphasis added)." Thus, even though the FTA is trying to overrule your decision by administrative fiat without appealing that decision, they continue to agree that service can constitute permissible tripper service even if it operates only when school is in session.

If you believe this request should be presented as a request for a declaratory judgment or through some other procedural mechanism, please let us know.

Thank you for considering our request for clarification of the Decision & Order.

Respectfully,

Philip G. Spellane
Dale A. Worrall

PGS: drb
cc:   *Via Email:*
     Christopher Taffe, Esq.
     Robert L. Browning, Esq.
     Ronald Jackson, Esq.
     Maisie Grace, Esq.
     Daniel R. Barney, Esq.
     Kim D. Mann, Esq.
     Joseph E. O'Donnell, Esq.
     Rodney O. Personius, Esq.
     Russell Jay Taylor, Jr., Esq.
     Robert J. Reden, Esq.
     Harold M. Carter, Esq.
     Charles Johnson, Esq.

226828 885520 8

EXHIBIT B

**U.S. Department of Justice**

United States Attorney

*Western District of New York*

RECEIVED

OCT   6 2008

DAVID G. LARIMER
U.S. District Judge
Western District of New York

*620 Federal Building*          (585) 263-6760
*100 State Street*          FAX(585) 263-6226
*Rochester, New York 14614*

October 6, 2008

Honorable David G. Larimer
United States District Judge
100 State Street
Rochester, New York 14614

     Re:  <u>Rochester-Genesee Regional Transportation Authority v.
           Hynes-Cherin et al.</u>
           07-CV-6378L

Dear Judge Larimer:

     By letter dated September 15, 2008, the Rochester-Genesee
Regional Transportation Authority (RGRTA) requested that the
Court issue a "clarification" of its Decision and Order dated
January 24, 2008.  The RGRTA has asked for this clarification for
its use in resolving a Grievance filed against RGRTA by the
Executive Board of the Amalgamated Transit Union (ATU) Local 282.

     The United States takes no position with respect to the
grievance pending between RGRTA and ATU Local 282.

     However, it is our position that the Court lacks subject
matter jurisdiction to issue such a clarification.  The complaint
was filed in this case on August 2, 2007.  This Court obtained
subject matter jurisdiction over the complaint by virtue of the
jurisdictional grants contained in 28 USC §§1346, 1331.  By
Decision and Order dated January 24, 2008, this Court granted
summary judgment in favor of the plaintiff.  By the terms of that
Order, this Court extended the stay of the Federal Transit
Administration's (FTA) decision of July 30, 2007 until March 24,
2008.  By Order dated February 14, 2008, this Court directed the
Clerk of the Court to enter final judgment.  On February 15,
2008, a final judgment was entered in favor of RGRTA on the
merits of the case and the case was closed.  No appeal was taken
by either party thereafter.

     Federal district courts, like other Article III courts, are

"courts of limited jurisdiction ... [that] possess only that
power authorized by [the] Constitution and statute."  Exxon Mobil
Corp. v. Allapattah Servs., 545 U.S. 546, 552 (2005).  "Without
jurisdiction the court cannot proceed at all in any cause.
Jurisdiction is power to declare the law, and when it ceases to
exist, the only function remaining to the court is that of
announcing the fact and dismissing the cause."  Ex parte
McCardle, 7 Wall. 506, 514, 19 L.Ed. 264 (1869); Steel Co. v.
Citizens for a Better Env't, 523 U.S. 83, 94 (1998) quoting
McCardle.

     This Court's subject matter jurisdiction was derived from
statute because a civil action was filed representing a case or
controversy.  When that case or controversy ceased to exist by
virtue of the entry of the final judgment and the dismissal of
that civil action, this Court's subject matter jurisdiction over
the complaint also ceased to exist.

     There are limited circumstances under which a court retains
subject matter jurisdiction following the dismissal of a lawsuit
upon the entry of a judgment.  The first instance involves a
motion pursuant to Rule 60 of the Federal Rules of Civil
Procedure.  In such an instance, a court is authorized to modify
a prior judgment or order to correct clerical mistakes, Rule
60(a), as well as for six specific grounds enumerated in the
rule, Rule 60(b).  Rule 60(b) motions are "generally not
favored[,] and [are] properly granted only upon a showing of
exceptional circumstances."  United States v. Int'l Broth. of
Teamsters, 247 F.3d 370, 391 (2d Cir. 2001).  See also,
Andrulonis v. United States, 26 F.3d 1224, 1235 (2d Cir. 1994).
New arguments based on hindsight regarding how a movant would
have preferred to have argued its case do not provide grounds for
Rule 60(b) relief.  Nemaizer v. Baker, 793 F.2d 58, 62 (2d Cir.
1986).  In this particular instance, RGRTA has not moved pursuant
to Rule 60; therefore, that procedure is not at issue here.[1]

     The second situation involves a court-ordered dismissal by
stipulation.  Courts have recognized that a District Court
retains jurisdiction after dismissal of the case to interpret the
terms of the settlement reflected in that dismissal order.
Nehmer v. U.S. Dept. of Veterans Affairs, 494 F.3d 846, 856 (9th

---

     [1] Likewise, a district court retains jurisdiction to alter or
amend a final judgment if a motion is timely filed  pursuant to
Rule 59(e), F.R.Civ.P., which provides that "[a]ny motion to
alter or amend the judgment shall be filed no later than 10 days
after entry of the judgment."  See eg.,  Brown v. Hovatter, 525
F.Supp.2d 754, 757 (D.Md. 2007). Rule 59(e) is not invoked by
RGRTA, undoubtedly given the untimeliness of such a motion.

Cir. 2007).   Again, this exception is inapplicable here.

The third circumstance giving rise to the retention of
jurisdiction by a court following the dismissal of a case is
where the disposition of the case involves court ordered
arbitration.   <u>Harry Hoffman Printing, Inc. v. Graphic Commc'ns,
International Union, Local 261</u>, 912 F.2d 608, 611 (2d Cir. 1990).
This exception is also not applicable in this case.

The fourth circumstance involves a court invoking post-
disposition jurisdiction to resolve ancillary matters arising
from the court proceeding.   Ancillary matters involve issues such
as attorney's fees or contempt.   <u>Kokkonen v. Guardian Life Ins.
Co.</u>, 511 U.S. 375, 378 (1994).

Ancillary matters do not include revisiting the final
decision of the Court to expound on its meaning.   An order is
"final" if it fully adjudicates the issues and clearly reflects
the intention of the court to conclude the matter.   <u>United States
v. F. & M. Schaefer Brewing Co.</u>, 356 U.S. 227, 234 (1958). *Accord*
<u>Gulfstream Aerospace Corp. v. Mayacamas Corp.</u>, 485 U.S. 271, 275
(1988)(a decision is final when it "ends the litigation on the
merits and leaves nothing for the court to do but execute the
judgment").

Here, this Court's January 24, 2008 Decision and Order fully
adjudicated all the issues before it arising from the allegations
in the complaint.   Furthermore, the Court's direction to the
clerk of the court to enter final judgment clearly evinced an
intention to conclude this lawsuit.   Therefore, the subject
matter jurisdiction of this Court expired upon the filing of the
final judgment in this case and this Court lacks authority to
issue the requested clarification.[2]

Finally, it is patently obvious that RGRTA's objective in
this request is simply an attempt to bolster its own
characterizations of the FTA's recently issued Statement of
Policy Governing School Bus Operations, the proposed version of
which is referenced on the last page of its September 15, 2008
letter.   The final statement was published on September 16, 2008,
at 73 Fed. Reg. 53384. (Exhibit A).   This final Statement of
Policy is a more detailed explanation of FTA's position on the
statutory mandates, expounding upon and more definitively
delineating its interpretation of the specific statutes at issue.

_____

[2] Even a broader reading of the decision of this Court
regarding the continuation of the stay leads to the inescapable
conclusion that this Court's involvement in this case concluded
on March 24, 2008 which is the date the stay was lifted.

Even were this new policy properly before this Court, *which it is not*, the FTA's interpretation is entitled to substantial deference. <u>Rochester-Genesee Regional Transp. Auth. v. Hynes-Cherin</u>, 531 F.Supp.2d 494, 506 (W.D.N.Y. 2008); <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512, 517 (1994).

For these reasons, the defendants request that the Court deny RGRTA's request to issue a clarification.

Very truly yours,

TERRANCE P. FLYNN
United States Attorney

By: CHRISTOPHER V. TAFFE
Assistant U.S. Attorney

CVT/lap

cc: Phillip G. Spellane, Esq.
    Charles Johnson, Esq.
    Robert L. Browning, Esq.
    Robert J. Reden, Esq.

# EXHIBIT A

*occurred, and avoided it by taking steps within his/her control which would not have risked causing another kind of mishap, the accident was preventable."* (Emphasis added.)

The intent of the safety permit program is to hold motor carriers that transport permitted materials to a higher safety standard due to the potential risks associated with transportation of these high-risk hazardous materials. In applying this standard to the safety fitness rating process, FMCSA recognizes that crashes in which the motor carrier's driver was not at fault and could not have reasonably avoided without further risk, should not adversely reflect on the safety fitness of the motor carrier. Similarly, denial of a safety permit based upon crashes which were not preventable, does not have a reasonable correlation to the safety standard required under the safety permit program.

In the safety rating context, FMCSA considers preventability when the carrier contests the evaluation of the accident factor by presenting compelling evidence that the recordable rate is not a fair means of evaluating the carrier's fitness under the accident factor. Similarly, FMCSA will consider preventability of crashes under the safety permit program. When a carrier contests the denial of its safety permit application based upon a crash rate that falls into the top thirty percent of the national average and submits compelling evidence that a crash or crashes listed in the MCMIS were not preventable, it should not be included in the crash rate calculation. The preventability standard that will be applied is the same standard that is used in the safety rating context.

*Preventability Policy Procedures*

Accordingly, FMCSA is implementing the following policy procedures: If a motor carrier's safety permit application is denied based upon a crash rate greater that the safety permit program crash rate threshold, the carrier may submit evidence to show that one or more crashes were not preventable. In order to preserve the right to seek administrative review of FMCSA's determination on the preventability of one or more crashes, the carrier should submit such evidence as part of a request for administrative review pursuant to § 385.423(c). The carrier should submit the request to FMCSA's Chief Safety Officer (CSO) and the Office of Chief Counsel, and must include adequate proof that the crash or crashes in question were not preventable. The standard for determining preventability is the same

as the standard found in Appendix A to Part 385:

If a driver who exercises normal judgment and foresight could have foreseen the possibility of the accident that in fact occurred, and avoided it by taking steps within his/her control which would not have risked causing another kind of mishap, the accident was preventable.

It is incumbent upon the carrier to provide reliable and objective evidence that the accident was not preventable. Such evidence may include but is not limited to police reports and other verifiable government reports or law enforcement and witness statements. The issue of whether a crash was or was not preventable under the above-stated standard will be initially addressed by the FMCSA Office of Enforcement and Compliance, Hazardous Materials Division in consultation with the Office of Chief Counsel, Enforcement and Litigation Division. If the initial determination results in a finding that one or more crashes were not preventable, the safety permit application will be reprocessed with the relevant crash or crashes removed from consideration in the crash rate calculation. If removal of the crash(es) results in a crash rate calculation that falls below the crash rate cut-off for the top 30 percent of the national average and no other disqualifying factors exist, FMCSA will issue a safety permit to the carrier. If the Office of Enforcement and the Office of Chief Counsel determine that the evidence submitted does not support a finding that the crash or crashes were preventable, the motor carrier may pursue its request for administrative review by the Chief Safety Officer of the denial of its safety permit application based upon its crash rate. The request for administrative review must have been timely filed and served in accordance with the requirements of 49 CFR 385.423.

Issued on: September 10, 2008.
**John H. Hill,**
*Administrator.*
[FR Doc. E8–21563 Filed 9–15–08; 8:45 am]
**BILLING CODE 4910–EX–P**

## DEPARTMENT OF TRANSPORTATION

**Federal Transit Administration**

### 49 CFR Part 605

**[Docket No. FTA–2008–0015]**

### Final Policy Statement on FTA's School Bus Operations Regulations

**AGENCY:** Federal Transit Administration (FTA), DOT.

**ACTION:** Final policy statement.

**SUMMARY:** Through this notice, the Federal Transit Administration (FTA) clarifies its policy with respect to its interpretation of *"tripper service"* and *"school bus operations"* under 49 CFR part 605.

**DATE:** *Effective Date:* The effective date of this final policy statement is September 16, 2008.

**ADDRESSES:** *Availability of the Final Policy Statement and Comments:* One may access this final policy statement, the proposed policy statement, and public comments on the proposed policy statement at docket number FTA–2008–0015. For access to the docket, please visit *http://www.regulations.gov* or the Docket Operations office located in the West Building of the U.S. Department of Transportation, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Michael L. Culotta, Attorney, Office of Chief Counsel, Federal Transit Administration, U.S. Department of Transportation, 1200 New Jersey Avenue, SE., 5th Floor—East Building, Washington, DC 20590. *E-mail: Michael.Culotta@dot.gov. Telephone:* (202) 366–1936.

**SUPPLEMENTARY INFORMATION:**

### I. Background

#### A. Introduction

On May 19, 2008, FTA issued a Notice of Proposed Policy Statement on FTA's School Bus Operations Regulations [1] to provide guidance in the context of the recent decision of the United States District Court for the Western District of New York in *Rochester-Genesee Regional Transportation Authority* v. *Hynes-Cherin.* [2] As of August 6, 2008, FTA received approximately 510 comments on its proposed policy statement.

In the final policy set forth below, FTA clarifies its guidance regarding FTA's interpretation of its school bus operations regulations. FTA shall construe the term "tripper service," as it has historically, to include modifications to fare collection or subsidy systems, modifications to the frequency of service, and de minimus route alterations from route paths in the immediate vicinity of schools to stops

[1] 73 FR 28,790 (May 19, 2008).
[2] 531 F.Supp.2d 494, 507 (W.D.N.Y. 2008) (setting aside FTA's interpretation of its school bus operations regulations under 49 CFR part 605).

located at or in close proximity to the schools. Consistent with that construction, FTA shall interpret the definition of "school bus operations" to include service that a reasonable person would conclude was primarily designed to accommodate students and school personnel and only incidentally to serve the nonstudent general public.

FTA stresses that its intent with this final policy is not to overhaul its school bus operations regulatory scheme. Rather, in the context of *Rochester-Genesee Regional Transportation Authority,* FTA intends to provide its grantees a basis which will allow them to continue to provide the service that FTA historically has allowed through administrative adjudications, while simultaneously satisfying the statutory requirements.

FTA acknowledges that the 2008–2009 academic year has commenced. However, because FTA is not overhauling its regulatory scheme and is continuing to allow the type of tripper service that it historically has allowed, this final policy will not negatively impact transportation for the 2008–2009 academic year if grantees have been complying with FTA's historical interpretation of its school bus operations regulations.

FTA expects to issue expeditiously a notice of proposed rulemaking to provide clearer definitions of "tripper service" and "school bus operations," as well as generally to update the existing school bus regulation.

### B. Statutory and Regulatory Framework

In 1973, Congress passed the Federal-Aid Highway Act, which requires FTA to provide financial assistance to a grantee under 49 U.S.C. Chapter 53 only if the grantee agrees "not to provide school bus transportation that exclusively transports students and school personnel in competition with a private school bus operator." [3] Congress' intent in enacting this provision was to prevent unfair competition between Federally funded public transportation systems and private school bus operators.[4]

In 1976, the Urban Mass Transportation Administration, now FTA, codified regulations under 49 CFR part 605 which implemented the above statutory provision.[5] Under 49 CFR

---

[3] Federal Aid Highway Act of 1973, Pub. L. No. 93–87, 164(b), 87 Stat. 250, 281–82 (1973) (codified as amended at 49 U.S.C. 5323(f) (2006)).

[4] *Chicago Transit Auth.* v. *Adams,* 607 F.2d 1284, 1292–93 (7th Cir. 1979) (citing H.R. Rep. No. 93–410, at 87 (1973) (Conf. Rep.); S. Rep. No. 93–355, at 87 (1973) (Conf. Rep.)).

[5] *See* Codification of Charter Bus Operations Regulations, 41 FR 14,122 (Apr. 1, 1976).

605.14, FTA may not provide financial assistance to a grantee "unless the applicant and the Administrator shall have first entered into a written agreement that the applicant will not engage in school bus operations exclusively for the transportation of students and school personnel in competition with private school bus operators." [6] The regulation defines "school bus operations" as "transportation by bus exclusively for school students, personnel and equipment * * *." [7]

The regulation exempts "tripper service" from the prohibition against school bus operations.[8] "Tripper service" is "regularly scheduled mass transportation service which is open to the public, and which is designed or modified to accommodate the needs of school students and personnel, using various fare collections or subsidy systems." [9]

### II. Rochester-Genesee Regional Transportation Authority v. Hynes-Cherin

On January 24, 2008, the United States District Court for the Western District of New York issued a decision in *Rochester-Genesee Regional Transportation Authority* which set aside FTA's interpretation of its school bus operations regulations under 49 CFR part 605.[10] The Court allowed the Rochester-Genesee Regional Transportation Authority (RGRTA) to restructure its public transportation operation through the addition of 240 new express school bus routes proposed to serve the Rochester City School District (RCSD) and its students.[11]

In its decision, the Court narrowly interpreted the word "exclusively" in FTA's definition of "school bus operations" and found that, because a member of the general public could, hypothetically, board a bus along one of RGRTA's proposed new 240 express routes, RGRTA's service technically would not "exclusively" transport students.[12] The Court therefore concluded that RGRTA's proposed express bus service did not constitute impermissible school bus operations.[13]

Additionally, the Court broadly interpreted FTA's definition of "tripper service." [14] The Court cited *United*

---

[6] 49 CFR 605.14 (2007).
[7] 49 CFR 605.3(b).
[8] 49 CFR 605.13.
[9] 49 CFR 605.3(b).
[10] *Rochester-Genesee Reg'l Transp. Auth.,* 531 F.Supp.2d at 507.
[11] *Id.* at 507–16.
[12] *Id.* at 507–09.
[13] *Id.*
[14] *Id.* at 512.

*States ex rel. Lamers* v. *City of Green Bay* for the proposition that a grantee may "completely redesign its transit system to accommodate school children as long as all routes are accessible to the public and the public is kept informed of route changes." [15]

FTA believes that, following the Court's narrow interpretation of "school bus operations" and its broad interpretation of "tripper service," a grantee could conclude that it would be permitted to restructure its public transportation operation dramatically to accommodate the needs of a local school district and its students, thereby displacing private school bus operators and their employees, provided the grantee keeps the service technically open to the public.[16] FTA believes that such an interpretation would contradict FTA's final policy as set forth herein.

### III. Previous FTA Policy

#### A. Tripper Service

Under its tripper service definition, FTA originally allowed grantees to accommodate students only with respect to "different fare collections and subsidy systems." However, through administrative decisions over the years, FTA broadened its interpretation of its tripper service definition to allow grantees to make accommodations beyond subsidies and fare collection systems. Specifically, FTA has allowed its grantees to make minor modifications to its route paths and frequency of service. As FTA stated in one matter concerning the Erie Metropolitan Transit Authority:

> Read narrowly, "modification of regularly scheduled mass transportation service to accommodate the needs of school students and personnel" means using different fare collections and subsidy systems. In practice, "modification of mass transportation service" has been broadened to include minor modifications in route or frequency of scheduling to accommodate the extra passengers that may be expected to use particular routes at particular times of day.[17]

For example, in *Travelways, Inc.* v. *Broome County Department of Transportation,* FTA stated that, "A familiar type of modification would be where the route deviates from its regular path and makes a loop to a school returning back to the point of deviation to complete the path unaltered." [18] FTA

---

[15] *Id.* at 512 (citing *United States ex rel. Lamers* v. *City of Green Bay,* 168 F.3d 1013, 1019 (7th Cir. 1999)).
[16] *Id.* at 509–16.
[17] *See In re* Erie Metropolitan Transit Authority 1, 4 (1989).
[18] *Travelways, Inc.* v. *Broome County Dep't of Transp.* 1, 7 (1985) (allowing a grantee to run a bus
Continued

reaffirmed this particular interpretation of tripper service in its October 12, 2007, RGRTA determination by permitting RGRTA to operate four loop-like route extensions, each only several blocks in length, to accommodate the needs of school students.[19]

FTA has not, however, allowed a grantee such as RGRTA to restructure its public transportation operation solely to accommodate the needs of school students—such a modification would be a major modification. Thus, in its October 12, 2007 letter to RGRTA, FTA rejected RGRTA's proposed addition of 240 new routes because it would have constituted a major overhaul of RGRTA's public transportation system exclusively for the purpose of accommodating the needs of school students.[20]

In addition to minor modifications to route paths, FTA has allowed grantees to modify route schedules and the frequency of service. For example, in *Travelways*, FTA stated, "Other common modifications include operating the service only during school months, on school days, and during school and opening and closing periods."[21]

Jurisprudence in United States courts has broadened the scope of FTA's tripper service definition to include essentially any modification. In *United States ex rel. Lamers* v. *City of Green Bay*, the Seventh Circuit stated, arguably in dicta, "[T]he City may completely redesign its transit system to accommodate school children as long as all routes are accessible to the public and the public is kept informed of route changes."[22] Citing *Lamers*, the Court in *Rochester-Genesee Regional Transportation Authority* allowed RGRTA to restructure its public transportation system by adding 240 new routes to accommodate the needs of RCSD and its students.[23]

### B. "Exclusive" School Bus Operations

FTA has had little prior formal policy regarding "exclusive" school bus operations under 49 CFR part 605. In 1982, FTA attempted to clarify the meaning of "exclusive" school bus

service through a rulemaking.[24] However, in 1990, FTA withdrew the rulemaking because it believed that the regulations were "functioning adequately."[25]

In school bus adjudications, parties did not directly address the issue of "exclusive" school bus operations until *United Food and Commercial Workers District Union Local One* v. *Rochester-Genesee Regional Transportation Authority*.[26] In resolving that issue, FTA examined the Federal-Aid Highway Act of 1973, found the language of the Act's school bus provision ambiguous, and looked to the legislative history of Act for some guidance.

In an early version of the Federal-Aid Highway Act, Congress did not use the word "exclusively" in the school bus provision, but rather, focused the language of the Act on preventing unfair competition between Federally funded grantees and private school bus operators. That language is as follows:

[N]o financial assistance is to be provided to an applicant which engages, directly or indirectly in transporting school children and personnel to and from school and school authorized functions or which proposes to expand present routes, schedules, or facilities for that purpose *in competition with or supplementary to service criteria provided by a private transportation company* or other person so engaged in so transporting such children and personnel.[27]

After the bill passed the House and the Senate, the conference modified the above provision in an effort to further protect private school bus operators from unfair competition with Federally funded grantees. The conferees used the following language:

[N]o federal financial assistance is to be provided under those provisions of law for the purchase of buses to any applicant who has not first entered into an agreement with the Secretary of Transportation that *the applicant will not engage in school bus operations in competition with private school bus operators.*[28]

As evinced by the above language, Congress intended to prevent unfair competition between Federally funded grantees and private school bus operators. Therefore, in *District Union Local One*, FTA concluded that it would defeat the purpose of the Federal-Aid Highway Act and eviscerate 49 U.S.C. 5323(f) if it accepted a grantee's

argument that its service was technically nonexclusive and open to the public, but where: (1) The grantee had designed the service specifically for students, without regard to demand from the nonstudent public; (2) the vast majority of passengers were students; and (3) as a result, the routes would displace the private school bus industry and its workers.[29] In efforts to prevent the unfair competition which Congress sought to prevent, FTA rejected RGRTA's arguments and prohibited RGRTA from providing its school bus service exclusively for school students. FTA utilized this same policy and analysis when it found non-compliant RGRTA's proposed service in its October 12, 2007 letter[30] and again in *Laidlaw Transit, Inc.* v. *Rochester-Genesee Regional Transportation Authority*.[31]

The Court in *Rochester-Genesee Regional Transportation Authority*, however, applied a narrower, more restrictive analysis when it interpreted the word "exclusively" in the context of "school bus operations." Notwithstanding the fact that RGRTA designed its 240 express school bus routes exclusively for the benefit of RCSD and its students, without regard for demand from the nonstudent public, the Court held that, because a member of the general public hypothetically could board a bus along one of RGRTA's proposed 240 routes, RGRTA's proposed service was not "exclusive" and therefore technically did not constitute impermissible "school bus operations."[32]

### III. Response to Public Comments

As of August 6, 2008, approximately 510 parties commented on FTA's Notice of Proposed Policy Statement on FTA's School Bus Operations Regulations. At the closing date of the docket, June 18, 2008, approximately 157 parties commented on FTA's proposed policy statement. FTA subsequently considered all comments received through August 6, 2008. The

---

[19] Letter from Federal Transit Administration to Rochester-Genesee Regional Transportation Authority at 6 (Oct. 12, 2007).

[20] *Id.* at 2–6.

[21] *Travelways* at 7.

[22] *United States ex rel. Lamers* v. *City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999).

[23] *Rochester-Genesee Reg'l Transp. Auth.*, 531 F.Supp.2d at 512–13.

[24] Advance Notice of Proposed Rulemaking, 47 FR 44,795, 44,803–04 (Oct. 12, 1982).

[25] Notice of Proposed Rulemaking: Withdrawal, 55 FR 334 (Jan. 4, 1990).

[26] FTA School Bus Docket Number 2006–02 1 (2007).

[27] S. Rep. No. 93–355, at 86 (1973) (emphasis added).

[28] S. Rep. No. 93–355, at 87 (emphasis added).

[29] *District Union Local One*, FTA School Bus Docket Number 2006–02 at 10–11 (holding the Rochester-Genesee Regional Transportation Authority's (RGRTA) school bus service was designed and modified "exclusively" for the Rochester City School District and its students because students constituted a significant proportion of passengers on the school bus routes and RGRTA designed the routes without regard to demand from the nonstudent public).

[30] *See* Letter from Federal Transit Administration to Rochester-Genesee Regional Transportation Authority at 3–4 (Oct. 12, 2007).

[31] *See Laidlaw Transit, Inc.* v. *Rochester-Genesee Reg'l Transp. Auth.*, FTA School Bus Docket Number 2007–01 1, 4 (2007).

[32] *Rochester-Genesee Reg'l Transp. Auth.*, 531 F.Supp.2d at 507–09.

---

to a point and express to a school from that point if the grantee ran a second bus along the regular route path from the point at which the first bus expressed to the school).

commenters represent a broad spectrum of stakeholders from geographic areas throughout the United States, and they provided comments on a wide variety of issues. Many commenters raised issues that are outside the scope of FTA's proposed policy statement, and FTA does not address those concerns in this final policy statement.

In this section, FTA responds to public comments by topic in the following order: (A) Policy Statement Generally; (B) "School Bus Operations"; (C) "Tripper Service"; (D) Unfair Competition; (E) Economic Issues; (F) Safety Issues; (G) Environmental Issues; (H) Congestion; (I) Rising Fuel Prices; (J) Local Issues; and (K) Alternative Policy Proposals and Amendments to 49 CFR part 605.

### A. Policy Statement Generally

Some commenters questioned whether FTA has the legal authority to issue this Final Policy Statement on FTA's School Bus Operations Regulations. These commenters questioned whether FTA should promulgate amended regulations rather than issue a policy statement.

*FTA Response:* FTA concludes that it is not required to promulgate amended regulations to implement this final policy because FTA is not changing the language of the regulatory text at 49 CFR part 605. FTA merely is clarifying its interpretation of that regulatory language, and FTA lawfully may accomplish this clarification through a policy statement. Furthermore, FTA is not altering the substance of its regulatory requirements under 49 CFR part 605; FTA merely is summarizing thirty-two years of its policy in one document, based on public comments and FTA's historical interpretation and enforcement of its school bus operations regulations. Indeed, many commenters applauded FTA's efforts to issue a policy statement to provide guidance in the context of *Rochester-Genesee Regional Transportation Authority.*

### B. "School Bus Operations"

Some commenters asserted that the word *"exclusively,"* as used in 49 U.S.C. 5323(f) and in FTA's definition of *"school bus operations"* at 49 CFR 605.3, is not ambiguous and, therefore, FTA must implement a regulatory scheme that allows FTA's grantees to transport students and school personnel so long as the service is technically open to the public.

Additionally, some commenters asserted that FTA's use of a *"reasonable person"* standard in its interpretation of *"school bus operations"* is vague.

Finally, at least one commenter expressed concern regarding whether and to what extent, under FTA's proposed policy, a grantee may create a new route to serve a school—particularly in communities experiencing population growth and development.

*FTA Response:* FTA rejects the notion that 49 U.S.C. 5323(f) is unambiguous. FTA believes that one may reasonably interpret the term *"exclusively"* in 49 U.S.C. 5323(f) and 49 CFR 605.3 to prohibit service that essentially is exclusively for students and school personnel, even though the service technically may be open to the nonstudent public. The relevant language of the regulation prohibits service that is *"exclusively for"* students and school personnel. FTA consequently concludes that it is reasonable and proper to consider whether service is, in fact, *"for"* such riders. FTA also relies heavily on the subsequent qualifying language of 49 U.S.C. 5323(f)—"in competition with a private schoolbus operator"—to justify this interpretation. To illustrate, if FTA permitted a grantee to provide school bus operations so long as the service is technically open to the public, then Congress's purpose of protecting private school bus operators would be nullified. Such an interpretation would create a loophole in the statutory and regulatory scheme which would permit FTA's grantees to displace private school bus operators. Clearly, Congress did not intend this result, otherwise, Congress would not have passed this statutory provision. Accordingly, in this final policy statement, FTA relies on an interpretation of 49 U.S.C. 5323(f) which reasonably ensures that FTA's grantees that transport school students are not providing school bus operations that are exclusive-in-fact.

With respect to the *"reasonable person"* standard, FTA points out that the standard has nearly a two hundred year history in the common law, and therefore, the standard is an acceptable standard in FTA's interpretation of its school bus operations regulations.[33] Courts have held that the reasonable person standard is an objective standard, and that a *"reasonable person"* is a person: (1) Of ordinary prudence, (2) who has knowledge of the law and is aware of its consequences, and (3) who exercises caution in similar circumstances.[34]

Finally, FTA does not intend to discourage grantees from creating new routes to serve new demand, so long as a reasonable person would conclude that the grantees designed the routes to serve some segment of the nonstudent general public. Therefore, in the final policy set forth below, FTA will interpret its definition of *"school bus operations"* to allow a grantee to create a new route to serve school students and personnel if a reasonable person would conclude that the grantee designed the route to serve some segment of the nonstudent general public.

### C. "Tripper Service"

With respect to FTA's interpretation of its "tripper service" definition at 49 CFR 605.3, some commenters requested clarification as to what constitutes a "de minimus" route deviation. Additionally, some commenters recommended that FTA should allow route deviations at multiple points along a route path—not just within the immediate vicinity of a school.

*FTA Response:* FTA intends a "de minimus" route deviation, as FTA uses the term in this final policy statement, to mean a route alteration that is truly minor. For example, historically, FTA has allowed its grantees to provide tripper service that deviates from an existing route path by several blocks.[35] FTA intends to identify definitively a specific threshold for determining whether an alteration is *"de minimus"* in its forthcoming notice of proposed rulemaking.

With respect to the locations of the route alterations, FTA stresses that it does not intend to significantly alter the type of service that it historically has allowed. In the past, FTA has allowed route alterations only within the immediate vicinities of schools, and FTA does not intend to break from that precedent in this final policy statement.

### D. Unfair Competition

Many commenters representing the interests of private school bus operators expressed support for FTA's proposed policy because the policy effectuates Congress's intent that Federally subsidized grantees do not displace private school bus operators. However, many commenters expressed concern that FTA's proposed policy would interfere with local transit agencies that transport students to school out of necessity, either because there are no private operators that provide the service in the local area or that private

---

[33] *See* Vaughan v. Menlove, (1837) 132 Eng. Rep. 490, and its progeny.

[34] *See* William L. Prosser & W. Page Keeton, Prosser and Keeton on Torts 173–93 (5th ed. 1984).

[35] *See, e.g., Travelways, Inc.* at 7; Letter from Federal Transit Administration to Rochester-Genesee Regional Transportation Authority, *supra* note 20, at 6.

operators charge an unreasonably high rate in exchange for its service.

*FTA Response:* In localities where no private operator exists or where a private operator charges an unreasonably high rate in exchange for service, FTA highlights an existing exemption for its school bus operations prohibition at 49 CFR 605.11(b). Under this provision, FTA allows its grantees to provide school bus operations if, in the local area, a private school bus operator is *"unable to provide adequate transportation, at a reasonable rate, and in conformance with applicable safety standards."*[35] FTA's final policy does not affect this exemption, and FTA suggests that interested parties apply to FTA for this exemption, if appropriate.

*E. Economic Issues*

Some commenters expressed economic concerns with respect to FTA's proposed policy. These commenters questioned the propriety of FTA's proposed policy, considering that many school districts have limited financial resources and a variety of educational needs. Additionally, some commenters proffered that private school bus operators are more expensive than Federally subsidized public transportation.

*FTA Response:* Congress, by passing the statutory provision now codified at 49 U.S.C. 5323(f), already has spoken to this issue and has decided that it is concerned with preventing unfair competition between Federally subsidized grantees and private school bus operators. Under 49 U.S.C. 5323(f), FTA may provide financial assistance to a grantee only if the grantee agrees "not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." [37] In its regulations, guidance, and this final policy statement, FTA intends to implement this statutory provision to effectuate Congress's intent to prevent unfair competition between Federally subsidized grantees and private school bus operators.

Moreover, some commenters suggested that taxpayers ultimately spend much more in tax dollars on public transit service for students rather than on private school bus operators.[38] For example, they estimate that the base cost of a transit bus is between $300,000 and $500,000, while they estimate that the base cost of a private school bus is

between $46,000 and $68,000.[39] These commenters also claim that the maintenance cost per mile for a transit bus is approximately $0.80 to $1.00, while they claim that the maintenance cost per mile for a private school bus is $0.34.[40] They therefore argue that, while a school district's direct payments to a federally subsidized public transit authority may be lower than payments to a private school bus operator, the total cost to the taxpayer may be much higher for federally subsidized transit service than for private school bus service. FTA lacks sufficient information to analyze this argument fully, but it will seek additional information and comment in connection with FTA's forthcoming notice of proposed rulemaking.

*F. Safety Issues*

Many commenters expressed concern that FTA, through its proposed policy, would create a more hazardous environment for school students commuting to school. Specifically, these commenters, with the notion that FTA intends to limit allowable service under its "tripper service" definition, suggest that FTA's proposed policy would result in more students walking, biking, and driving across busy roads while traveling to school. Some commenters raised a similar safety concern and believe that, with limitations on "tripper service," FTA's proposed policy will result in less direct routes and increased transfers for students traveling to school. Consequently, these commenters write, FTA's proposed policy will cause school students to congregate at transfer points, which will lead to increased crime around these transfer points.

Many commenters also expressed concerns regarding the safety of private school buses. These commenters asserted that public buses are safer than private buses. Alternatively, many commenters asserted that private buses, which are subject to stringent safety standards imposed by the National Highway Traffic Safety Administration (NHTSA), are safer than public buses. For example, these commenters noted that NHTSA requires school buses to be equipped with warning lights, additional mirrors for drivers, "stop arms," and rollover protection. Additionally, these commenters assert, that on public buses, school students may be exposed to any number of

unknown influences, such as pedophiles and child molesters.

*FTA Response:* Congress, by passing the statutory provision now codified at 49 U.S.C. 5323(f), already has spoken to this issue and has decided that it is concerned with preventing unfair competition between Federally subsidized grantees and private school bus operators. Under 49 U.S.C. 5323(f), FTA may provide financial assistance to a grantee only if the grantee agrees "not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." [41] In its regulations, guidance, and this final policy statement, FTA intends to implement this statutory provision to effectuate Congress's intent to prevent unfair competition between Federally subsidized grantees and private school bus operators.

Moreover, some commenters misconstrued FTA's intent. FTA did not propose to eliminate transit service that historically has qualified as tripper service. Therefore, FTA believes that its final policy will not result in the above-mentioned increased safety hazards.

With respect to the safety of public buses versus private buses, FTA recognizes that, most notably, private school buses are subject to stringent safety standards promulgated by NHTSA.[42] For example, NHTSA imposes on school bus manufacturers restrictions regarding rear view mirrors, safety lights, "stop signal arms," rollover protection, body joint strength, passenger seating, and crash protection.[43] Accordingly, FTA does not believe that private school buses afford an inherently unsafe means of school transportation.

*G. Environmental Issues*

Many commenters asserted that FTA's proposal would result in the elimination of numerous transit routes. These commenters asserted that, with fewer transit routes available to students, more students would drive vehicles to school. The affect, these commenters argued, would be greater harm to the environment.

Some commenters also argued that public buses are more fuel-efficient than private buses. Alternatively, many commenters asserted that private buses are more fuel-efficient than public buses. One commenter provided evidence that the average fuel miles per gallon for transit buses is 4.5, while the

---

[35] 49 CFR 605.11(b).

[36] 49 U.S.C. 5323(f).

[37] *See* Comment Number FTA–2008–0015–0184.1 (June 19, 2008).

[38] *Id.* (noting that the useful life of a transit bus is approximately 12 to 15 years, while the useful life of a private school bus is comparable— approximately 12 years).

[40] *Id.*

[41] 49 U.S.C. 5323(f).

[42] *See, e.g.,* Federal Motor Vehicle Safety Standards, 49 CFR Part 571 (2007).

[43] 49 CFR Part 571.

average fuel miles per gallon for private school buses is 6.5.[44] Scores of commenters asserted that private school bus service is approximately 40% more fuel-efficient than public bus service.[45]

*FTA Response:* Congress, by passing the statutory provision now codified at 49 U.S.C. 5323(f), already has spoken to this issue and has decided that it is concerned with preventing unfair competition between Federally subsidized grantees and private school bus operators. Under 49 U.S.C. 5323(f), FTA may provide financial assistance to a grantee only if the grantee agrees "not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." [46] In its regulations, guidance, and this final policy statement, FTA intends to implement this statutory provision to effectuate Congress's intent to prevent unfair competition between Federally subsidized grantees and private school bus operators. Moreover, these concerns are based on the misperception that FTA's proposed policy would prohibit tripper service that FTA historically has permitted.

In response to specific concerns regarding environmental harm and fuel-efficiency concerns, FTA concludes that there is no reliable method to determine the effect of its school bus operations policy on the environment. There are numerous factors that will vary from locality to locality, such as, (1) the number of additional vehicles utilized as a direct result of FTA's school bus operations policy, (2) the fuel emissions of those vehicles, and (3) the manufacturing date of those vehicles. FTA notes that no commenter provided evidence that FTA's proposed policy would result in greater harm to the environment.

FTA does not anticipate that its school bus operations policy will have a significant environmental impact, and, thus, FTA does not believe that this final policy requires additional approvals under the National Environmental Policy Act.[47]

## H. Congestion

Many commenters asserted that FTA proposes to eliminate numerous transit routes. These commenters alleged that, with less transit routes available to students, more students would drive vehicles to school. The affect, these

commenters argued, would be increased congestion.

*FTA Response:* Congress, by passing the statutory provision now codified at 49 U.S.C. 5323(f), already has spoken to this issue and has decided that it is concerned with preventing unfair competition between Federally subsidized grantees and private school bus operators. Under 49 U.S.C. 5323(f), FTA may provide financial assistance to a grantee only if the grantee agrees "not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." [48] In its regulations, guidance, and this final policy statement, FTA intends to implement this statutory provision to effectuate Congress's intent to prevent unfair competition between Federally subsidized grantees and private school bus operators.

Moreover, these concerns are based on the misunderstanding that FTA's proposed policy would prohibit tripper service that FTA historically has permitted. In this final policy statement, FTA does not propose to alter its historical interpretation of "tripper service" fundamentally, and therefore, FTA does not believe that its final policy will affect congestion.

## I. Rising Fuel Prices

Some commenters expressed concern about rising fuel prices and the effect these prices will have on school transportation.

*FTA Response:* Congress, by passing the statutory provision now codified at 49 U.S.C. 5323(f), already has spoken to this issue and has decided that it is concerned with preventing unfair competition between Federally subsidized grantees and private school bus operators. Under 49 U.S.C. 5323(f), FTA may provide financial assistance to a grantee only if the grantee agrees "not to provide schoolbus transportation that exclusively transports students and school personnel in competition with a private schoolbus operator." [49] In its regulations, guidance, and this final policy statement, FTA intends to implement this statutory provision to effectuate Congress's intent to prevent unfair competition between Federally subsidized grantees and private school bus operators.

Moreover, these commenters did not specify how rising fuel prices should affect FTA's final policy. Notably, rising fuel prices affect both public transit authorities and private school bus operators in any given locality,

therefore, FTA estimates that rising fuel prices should affect school districts in a similar manner, regardless of the type of service that they use to transport students. Without a more particularized concern from these commentators, it is difficult for FTA to speculate how rising fuel prices should impact and factor into FTA's final policy.

## J. Local Issues

Approximately 141 of the 510 commenters represent the Oakland, California area, and these commenters expressed concerns that FTA proposed to eliminate transit service in that region. Approximately 27 commenters from Washington State expressed similar concerns.

*FTA Response:* These comments are unfounded: FTA did not propose to eliminate any particular transit service through its proposed policy statement, and FTA does not propose to eliminate any particular transit service through this final policy statement. Moreover, FTA's final policy does not prohibit transportation that historically has qualified as tripper service. Therefore, so long as public transit authorities in these areas are complying with FTA's historical interpretation of its school bus operations regulations, FTA's final policy should not interfere with the transportation that these public transit authorities provide.

## K. Alternative Policy Proposals and Amendments to 49 CFR Part 605

Some commenters offered alternative policy proposals, including amendments to 49 CFR part 605, for FTA's consideration. Specifically, some commenters proposed that FTA require an annual period of open bidding on school transportation, with bid submissions from interested parties received in April and FTA selections, based on quality and cost, in May.

Some commenters also proposed additional exemptions under 49 CFR part 605, such as exemptions for: (1) Areas with populations of less than 200,000 persons; (2) transit agencies that operate in communities without school district transportation subsidies; (3) grantees that provide service to school districts that operate some service with their own private fleets; and (4) routes serving secondary schools.

Lastly, some commenters suggested that FTA utilize a negotiated rulemaking proceeding to formulate its forthcoming proposed rule.

*FTA Response:* With respect to the open bidding proposal, FTA believes that such a proposal amounts to a new regulatory scheme, which FTA cannot appropriately adopt through a policy

---

[44] *See* Comment Number FTA–2008–0015–0184.1 (June 19, 2008).

[45] *See, e.g.,* Comment Number FTA–2008–0015–0242.1 (July 25, 2008).

[46] 49 U.S.C. 5323(f).

[47] *See* 23 CFR 771.117(c)(20) (2008).

[48] 49 U.S.C. 5323(f).

[49] 49 U.S.C. 5323(f).

statement. The proposal would require an amendment to FTA's school bus operations regulations, not its interpretation of those regulations, and FTA would have to adopt such a scheme through a rulemaking.

With respect to the proposed exemptions, FTA believes that, if adopted, these proposals would constitute substantive changes to the text of FTA's school bus operations regulations. FTA already lists a series of allowable exemptions at 49 CFR 605.11. Thus, FTA believes that it cannot appropriately consider these exemptions within the rubric of this final policy statement.

Finally, FTA believes that the comments suggesting a negotiated rulemaking fall outside the scope of this policy statement. FTA will appropriately address any comments regarding a notice of proposed rulemaking in that forum.

### IV. Final FTA Policy

#### A. Purpose of Final FTA Policy

In the final policy set forth below, FTA clarifies its guidance regarding FTA's interpretation of its school bus operations regulations under 49 CFR part 605 in light of the Court's decision in *Rochester-Genesee Regional Transportation Authority*. FTA respects the Court's decision in the Western District of New York. However, FTA finds that the Court's decision is problematic because, if applied elsewhere in the United States, it could obstruct FTA's ability to execute and implement Congress's school bus prohibition and Congress's express intent regarding that prohibition. Therefore, FTA issues this final policy statement to clarify the status of FTA's guidance regarding its interpretation of its school bus operations regulations under 49 CFR part 605, and to resolve, for jurisdictions outside of the Western District of New York, conflicting issues between FTA's school bus operations policy and the Court's decision in *Rochester-Genesee Regional Transportation Authority*.

Additionally, FTA intends to issue expeditiously a notice of proposed rulemaking to provide clearer definitions of "tripper service" and "school bus operations," as well as to generally update the existing school bus regulation.

#### B. Tripper Service

With respect to a grantee's regularly scheduled public transportation service, FTA shall interpret the definition of "tripper service" under 49 CFR 605.3(b), as it historically has interpreted that

definition, to allow a grantee to (1) utilize "various fare collections or subsidy systems," (2) modify the frequency of service, and (3) make de minimis route alterations from route paths in the immediate vicinity of schools to stops located at or in close proximity to the schools. For example, a grantee may provide more frequent service on an existing route to accommodate increased student ridership before and after school. Furthermore, a grantee may alter route paths to accommodate the needs of school students by making de minimis route alterations from route paths to drop off and pick up students at stops located on school grounds or in close proximity to the schools.

FTA believes that this policy regarding its interpretation of the definition of "tripper service" is consistent with both the statutory language and the language of 49 CFR 605.3(b). This policy permits only the type of design or modification accommodations that FTA historically has allowed and does not represent a departure from FTA's prior guidance on this matter.

#### C. "Exclusive" School Bus Operations

To effectuate the intent of Congress when it enacted the school bus operations prohibition now codified at 49 U.S.C. 5323(f), FTA shall interpret the term "exclusively" in the definition of "school bus operations" under 49 CFR 605.3(b) to encompass any service that a reasonable person would conclude was primarily designed to accommodate students and school personnel, and only incidentally to serve the nonstudent general public. Additionally, grantees may create new routes to serve school students and personnel if a reasonable person would conclude that the grantees designed the routes to serve some segment of the nonstudent general public.

FTA believes that maintaining this interpretation of "exclusively" is consistent with the legislative history on the issue and would allow FTA effectively to implement the express intent of Congress, which is to prevent unfair competition between Federally funded grantees and private school bus operators. This policy does not represent a departure from FTA's prior guidance on this matter, and is merely intended to provide FTA with additional flexibility when interpreting 49 U.S.C. 5323(f) and 49 CFR 605.3(b) and effectuating the intent of Congress.

Issued in Washington, DC on this 11th day of September 2008.

James S. Simpson,

*Administrator.*

[FR Doc. E8–21601 Filed 9–15–08; 8:45 am]

**BILLING CODE 4910–57–P**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 679

[Docket No. 080225265–81165–02]

RIN 0648–AW28

### Fisheries of the Exclusive Economic Zone Off Alaska; Recordkeeping and Reporting

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS issues regulations to exempt groundfish catcher/processors and motherships equipped with an operational vessel monitoring system transmitter from check–in/check–out requirements. This action reduces paperwork requirements for certain catcher/processors and motherships and changes the definitions for "active" period for motherships and trawl, longline, and pot gear catcher/ processors. This action reduces administrative costs for both the fishing industry and NMFS.

**DATES:** Effective October 16, 2008.

**ADDRESSES:** Written comments regarding the burden-hour estimates or other aspects of the collection–of–information requirements contained in this final rule may be submitted to NMFS Alaska Region, P. O. Box 21668, Juneau, AK 99802 or the Alaska Region NMFS website at *http:// alaskafisheries.noaa.gov* and by email to *David__Rostker@omb.eop.gov*, or fax to 202–395–7285.

**FOR FURTHER INFORMATION CONTACT:** Patsy A. Bearden, 907–586–7008.

**SUPPLEMENTARY INFORMATION:**

#### Background

NMFS manages the U.S. groundfish fisheries of the exclusive economic zone (EEZ) off Alaska under the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area and the Fishery Management Plan for Groundfish of the Gulf of Alaska (FMPs). The North Pacific Fishery Management Council

EXHIBIT C

.



**SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY**
ATTORNEYS AT LAW

**INDIANAPOLIS**

CHICAGO • WASHINGTON, D.C. • LOS ANGELES • KANSAS CITY • CHATTANOOGA • DETROIT

1850 M Street, N.W., Suite 280   Washington, D.C. 20036-5804
phone (202) 783-9222   fax (202) 783-9230
www.scopelitis.com

**RECEIVED**

OCT   9 2008

DAVID G. LARIMER
U.S. District Judge
Western District of New York

**KIM D. MANN**
kmann@scopelitis.com
DIRECT DIAL: (202) 551-9025

October 8, 2008

<u>**VIA FEDERAL EXPRESS**</u>

The Hon. David G. Larimer
United States District Judge
2500 U.S. Courthouse
100 State Street
Rochester, NY 14614

     Re:   *Rochester-Genesee Regional Transportation Authority v.*
           *Hynes-Cherin and Federal Transit Administration,*
           Civ. No. 07-cv-06378-DGL (W.D.N.Y.)

Dear Judge Larimer:

     On behalf of Laidlaw Transit, Inc., d/b/a First Student, intervenor in the above referenced, now closed, civil action, we write to oppose the letter-request of petitioner Rochester-Genesee Regional Transportation Authority ("RGRTA"), dated September 15, 2008, asking you to clarify your now-final Decision and Order of January 24, 2008 ("Decision") in this civil action.  Laidlaw Transit urges you not to entertain RGRTA's extra-judicial request for relief.  The request is improper because it conflicts with the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and in effect elicits an advisory opinion on a subject – whether questionable public school bus operations qualify as lawful "tripper service" under federal regulations, 49 C.F.R. Part 605 – that Congress has charged the Federal Transit Administration ("FTA") to make in the first instance.  49 U.S.C. § 5323(f)(2) and § 5301(f).

     The Decision became final and effective February 15, 2008 when the Court entered judgment in favor of RGRTA.  A federal district court may disturb a final and effective judgment only pursuant to Fed. R. Civ. P. 59 or 60. Rule 59 requires motions to reopen judgments relying on any of the rule's bases be filed within 10 days of entry of judgment.  RGRTA's letter comes almost seven months too late.  Rule 59's 10-day time limit is jurisdictional and thus unwaivable.  Fed. R. Civ. P. 6(b); *Lapiczak v. Zaist,* 451 F.2d 79, 80 (2d Cir. 1971).

SERVICES OUTSIDE CALIFORNIA AND MICHIGAN PROVIDED BY SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, PROFESSIONAL CORPORATION
SERVICES IN MICHIGAN PROVIDED BY SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, PROFESSIONAL LIMITED LIABILITY COMPANY
SERVICES IN CALIFORNIA PROVIDED BY SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LIMITED LIABILITY PARTNERSHIP

The Hon. David G. Larimer
October 8, 2008
Page 2

Rule 60 authorizes relief from final judgments in only very limited circumstances – to correct clerical mistakes, oversights, and omissions; address inadvertence, surprise, or excusable neglect; consider newly discovered evidence; rectify fraud, misrepresentation, or misconduct; or address judgments that have become void, satisfied, released, discharged, or no longer equitable to apply or that were based upon prior judgments subsequently reversed or vacated. Fed. R. Civ. P. 60(a) and (b). *See In re Frigitemp Corp.*, 781 F2d. 324, 326-27 (2d Cir. 1986). None of these circumstances is present here.[1]  Moreover, Rule 60(b) requires requests for relief from final judgments be set forth in motions. Rule 60(c). RGRTA has filed no motion, and its letter-request neither mentions Rule 60 nor purports to rest on any grounds that would qualify under the limited, narrow exceptions identified in Rule 60(a) or (b).

The Court should decline RGRTA's invitation to reopen the Decision and "interpret" its conclusions on a separate independent basis: such judicial action would interfere with FTA's unique role, carved out by Congress, to determine whether student transportation is prohibited "school bus operations," 49 U.S.C. § 5323(f)(2), or qualifies as lawful "tripper service" under 49 C.F.R. §§ 605.3(b), 605.11, 605.19, 605.30, thus entwining the Court in an exercise exceeding its own limited role as a reviewing court, reviewing final decisions of FTA. *See* 5 U.S.C. §§ 703, 704. Through its September 15, 2008 letter-request, RGRTA posits materially different school bus service which FTA has not yet been given the opportunity to evaluate under its school bus regulations.

In the midst of the Court's initial judicial review of the FTA orders rejecting RGRTA's existing school bus operations, RGRTA proposed revamping its "tripper service," internally re-naming it "Express Service," and offering it to the Rochester School District as a substitute for RGRTA's discredited existing "tripper service," subject only to receiving Court approval. Integral to RGRTA's new "Express Service" was RGRTA's proposal to furnish this "tripper service" on all weekdays even when Rochester schools were not in session. The Court, in

[1] Rule 60(b) also includes one non-specific "catch-all" exception to the finality of judgments – for "any other reason justifying relief from the operation of the judgment." Rule 60(b)(6). This exception is reserved for the rarest of circumstances.   It applies only in "exceptional circumstances," *United States v. Cirami*, 535 F.2d 736, 738 (2d Cir. 1976), "'only when there are extraordinary circumstances justifying relief' or 'when the judgment may work an extreme or undue hardship.'"   *Tyger v. Air Line Pilot Ass'n, Intern.*, 2008 WL 3852236, *2 (E.D.N.Y. 2008), *quoting Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986); *Harris v. United States*, 367 F.3d 74, 81 (2d Cir. 2004); and *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977).   No such extraordinary or exceptional circumstance exists here.

The Hon. David G. Larimer
October 8, 2008
Page 3

approving this "Express Service" as legitimate "tripper service," concluded that
RGRTA had made, or promised to make, certain material changes in its
ostensible "tripper service" sufficient to rectify deficiencies FTA had relied upon
in its July 30, October 12, and October 17, 2007 decisions and determination
to condemn RGRTA's existing school bus service.   Decision at 22-23.   The
Court expressly identified three new elements of the Express Service as
exemplifying innovations RGRTA would be making to satisfy FTA objections –
operating even when school was not in session, stopping at all bus stops, and
printing revised accurate schedules.  Id.  These three service revisions led the
Court to conclude that RGRTA's "Express Service" would be open to the general
public, not exclusively transporting students.  Id. at 23.

Now, eight months later, RGRTA advises the Court it has unilaterally
discontinued providing Express Service – at least the Express Service the Court
approved in its Decision – shutting it down when Rochester schools are not in
session.  Given the Court's stated predicate for approving that service, it is
apparent RGRTA has implemented a material modification to its Express
Service. That modification is of the very service feature the Court recognized in
its Decision as overcoming the FTA-designated deficiencies in the abandoned
RGRTA school bus service.

The Court lacks authority to review, evaluate, and determine whether
RGRTA's modified service is lawful "tripper service" before FTA has evaluated
that new service under its school bus regulations.  FTA must determine in the
first instance whether, under those regulations as the Court has construed
them in its Decision, this material change is sufficient to render RGRTA's
Express Service no longer open to the general public and not exclusively for the
transportation of students before the Court may weigh in on this issue.   The
Administrative Procedure Act limits this Court's role to that of a reviewing
court.  See 5 U.C.C. §§ 703, 704.  RGRTA, in its September 15, 2008 letter,
asks this Court to go beyond reviewing an FTA decision deciding a challenge to
an existing public school bus operation.  It wants the Court to make that
decision in the first instance.     There is no legal foundation for such a
preemptive role for the Court.  Under the circumstances, your clarification or
interpretation would amount to nothing more than an unconstitutional
advisory opinion, and the judiciary may not provide advisory opinions.  Preiser
v. Newkirk, 422 U.S. 395, 401-02 (1976).

RGRTA is not without a remedy, a proper forum for securing guidance.
It may allow the labor grievance arbitration proceeding to run its course,
actively participating in that proceeding and taking advantage of the appellate
process, if any, if dissatisfied with the final result, a result about which it may

The Hon. David G. Larimer
October 8, 2008
Page 4

only speculate at this time.  It may petition FTA to reopen the agency complaint
proceeding in which the unfavorable FTA orders were issued and request FTA
to reassess the revised "Express Service" in light of the changes made and the
teachings of this Court in the Decision.  It may then appeal the FTA decision to
this Court if dissatisfied.    Its letter-request confirms that the Rochester
students will not suffer any hardship or otherwise be adversely affected by
either course of action; RGRTA promises to re-institute Express Service on all
weekdays, rather than discontinuing it altogether, in the event of an adverse
ruling from this Court.

Sincerely,

Kim D. Mann
One of the Attorneys for
Laidlaw Transit, Inc., d/b/a First Student

cc:    Philip G. Spellane, Esquire
       David G. Edwards, Esquire
       Dale Worrall, Esquire
       Christopher V. Taffe, Esquire
       Ronald Jackson, Esquire
       Christopher Van Wyk, Esquire
       Maisie Grace, Esquire
       Michael J. Looby, Esquire
       Charles G. Johnson, Esquire
       Joseph E. O'Donnell, Esquire
       Robert J. Reden, Esquire
       Rodney O. Personius, Esquire
       Daniel R. Barney, Esquire
       Robert L. Browning, Esquire